ATTORNEYS FOR APPELLANT
Steven E. Ripstra
Jasper, Indiana

Laura Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Andrew A. Kobe
Henry A. Flores, Jr.
Deputy Attorneys General
Indianapolis, Indiana



FILED
Sep 24 2015, 10:29 am
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 22S00-1206-DP-359

WILLIAM CLYDE GIBSON III,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Floyd County Superior Court, No. 22D01-1204-MR-919
The Honorable Susan L. Orth, Judge

On Direct Appeal

**September 24, 2015**

**Massa, Justice.**

A jury found William Clyde Gibson III guilty in the murder of his late mother's elderly friend and recommended the death penalty, which the trial court imposed. In this direct appeal Gibson raises six issues, which we rephrase as whether the trial court abused its discretion in denying: his request for a fourth continuance, his request to dismiss an entire venire panel, his request to ask a case-specific question during voir dire, his request to dismiss several jurors for cause, and his request to instruct the jury on voluntary manslaughter; the final issue he raises is

whether his sentence of death is appropriate. Finding no errors and no reason to revise his sentence, we affirm.

**Facts and Procedural History**

After William Clyde Gibson III's mother died, he began spending time with his late mother's best friend, 75-year-old Christine Whitis, and he began developing sexual feelings toward her. On April 18, 2012, an intoxicated Gibson invited Whitis into his mother's home and shoved his hand up her shirt, grabbing her breast. She responded by asking what his mother would think of his behavior. According to Gibson, this angered him. He went on to violently sexually assault Whitis: he ripped off her clothes, pushed his hand up her vagina, performed oral sex in a way that resulted in lacerations, and caused injuries to her arms, legs, face, and her head, which was likely slammed against something hard.

Gibson eventually killed Whitis by strangling her, taking more than four minutes to end her life. Over the course of the next 30 hours, after she was dead, Gibson continued performing oral sex on Whitis, even biting and "violently plunging his fist into her vagina." Tr. at 2919. He manipulated her body to such a degree he ended up breaking her back. He dragged her body into the garage, where he left her legs separated and propped up on a box, exposing her vagina, and he likely used beer bottles to penetrate her. He also used a knife to cut off one of Whitis's breasts. Gibson took Whitis's severed breast with him, placing it in the console of her van, which he drove to various bars. He eventually returned home, and after hiding her van in the neighboring apartment complex and her purse in a closet, Gibson invited a friend over for more drinks.

When Gibson's sisters came to their mother's house the next day, they discovered Whitis's body and called the police. After a brief chase, the police apprehended a drunk Gibson driving Whitis's van. He admitted to killing her, although he denied having a plan to do so, saying he only wanted to have sex with her. Gibson claimed he "just snapped." Ex. 6 at 243.

The State charged Gibson with murder and being a habitual offender. In seeking the death penalty, it charged four aggravators: an intentional killing (1) while committing criminal deviate conduct involving defendant's mouth and victim's sex organ, (2) while committing criminal deviate conduct involving penetration by an object, (3) while on probation, and (4) dismembering the victim. App. at 599–600; see Ind. Code § 35-50-2-9(b). During the investigation, police discovered two other murder victims whom Gibson admitted killing and which the State initially included as aggravators. But, before the trial began, the Court ordered all references to those two other cases be excluded.

There was substantial pretrial publicity about the case; thus, although the crime occurred in Floyd County and was tried there, the parties agreed the jury pool would come from Dearborn County. Jury selection spanned four days, and the court conducted voir dire in two phases: during the first phase, fifty potential jurors reported in the morning and fifty more in the afternoon. They were questioned in groups of five—and often individually—on hardship, publicity, and the death penalty. Those not dismissed reported back for the second phase during which they were placed in the jury box, twelve at a time, so that both sides could speak with them and submit strikes.

A year and a half after Gibson was charged, his case went to trial in three phases: guilt as to murder, penalty as to murder, and a determination as to his habitual offender status. After a week-long trial, the jury found Gibson guilty of murder. It reconvened the next week for the penalty phase. As mitigation, Gibson offered evidence of growing up in a "military-style" house with a father that drank, although his sister described their childhood as "pretty normal." Tr. at 3597, 3606. A former Floyd County correctional officer described Gibson's suicide attempt while in custody. And, a mental health expert testified that Gibson's own alcoholism combined with certain mental impairments, including bipolar disorder and antisocial personality disorder, caused him to fear rejection and abandonment; thus, Whitis's rejection of his sexual advances could have elicited a reaction different than a normal person. Nevertheless, the jury found all four aggravators proven beyond a reasonable doubt and that those aggravating circumstances outweighed any mitigating circumstances; it recommended the death penalty. During the third

3

phase, the jury found Gibson to be a habitual offender. The trial judge sentenced Gibson to death for Whitis's murder and withheld sentence on the habitual offender determination. It denied Gibson's motion to correct several alleged errors.

Gibson has directly appealed his capital case to this Court, for we have mandatory and exclusive jurisdiction over a criminal appeal where the defendant is sentenced to death. Ind. Appellate Rule 4(A)(1)(a). He argues six errors occurred at the trial court, which we discuss below in chronological order. Additional facts pertaining to each issue are provided as necessary.

## I.     The Trial Court Did Not Abuse Its Discretion in Denying Gibson's Request for a Fourth Continuance.

Gibson was charged with Whitis's murder in April of 2012, and his trial was initially set for August of that year. In June, however, the parties jointly moved for a continuance, which the trial court granted, rescheduling trial for February of 2013. In December, Gibson moved for a second continuance, this time with the State objecting. Nevertheless, his trial was rescheduled for July of 2013. In April, Gibson moved for a third continuance. The court heard extensive argument from both sides, ultimately granting Gibson's motion over the State's objection and rescheduling trial for October of 2013. Gibson moved for a fourth continuance in August, arguing the State had continued providing discovery and he needed to follow up on certain leads. The State objected. The trial court heard argument, took the matter under advisement, and denied Gibson's request. Now on appeal, Gibson argues the trial court erred in denying him that fourth continuance.

Courts are generally reluctant to grant continuances in criminal cases merely to allow for additional preparation. Palmer v. State, 704 N.E.2d 124, 127 (Ind. 1999). But a defendant is statutorily entitled to a continuance where there is an "absence of material evidence, absence of a material witness, or illness of the defendant, and the specially enumerated statutory criteria are

satisfied." Elmore v. State, 657 N.E.2d 1216, 1218 (Ind. 1995) (citing Ind. Code § 35-36-7-1). If none of those conditions are present, however, a trial court has wide discretion to deny a motion to continue. Evans v. State, 489 N.E.2d 942, 948 (Ind. 1986). We will only find an abuse of that discretion where a defendant was prejudiced as a result of not getting a continuance. Id. To demonstrate such prejudice, a party must make a "specific showing as to how the additional time requested would have aided counsel." Carter v. State, 686 N.E.2d 1254, 1261 (Ind. 1997).

Here, Gibson did not argue he was statutorily entitled to a continuance, instead maintaining he simply needed more time to review discovery materials. And the trial court found Gibson made "no showing how additional time would aid or avoid harm to the Defendant or why two full months isn't sufficient time to get the remainder completed." Tr. at 340. That conclusion is consistent with our review of the record; we thus determine the trial court was well within its discretion in denying the continuance.

### II. The Trial Court Did Not Err in Refusing to Dismiss an Entire Venire Panel or Declare a Mistrial Based on Some Potential Jurors' Exposure to Gibson's Other Murder Charges.

During the first day of the first phase of voir dire, one potential juror informed the court he overheard another potential juror, who was seated near him in the waiting room, tell four or five people in a "whispery" voice that "the accused has murdered three women." Tr. at 950, 955. In response, Judge Orth went into the waiting room where the fifty-person venire panel was waiting, and admonished, "As a potential juror, you are strictly prohibited from doing any investigation about this case or speaking about this case, including to other prospective jurors." Tr. at 955. She asked the potential jurors to raise their hands if they heard someone say something about the case; six did so.

Concerned the entire panel had been tainted, Gibson moved to dismiss all fifty potential jurors for discussing inadmissible evidence. The trial court denied that motion, finding it more

5

appropriate to "poll and talk to everyone individually." Tr. at 984. In groups of five, the potential jurors were asked whether they learned anything about the case outside of what they had been told by the court or had gleaned from the questionnaire; if any of the five responded affirmatively, they were questioned individually. Many of the jurors informed the court they had visited the website of—or listened to—a local radio station, which covered Gibson's crimes extensively. All potential jurors who reported hearing Gibson was accused of multiple murders were immediately excused for cause. Nevertheless, Gibson renewed his motion to dismiss the entire panel.

On appeal, Gibson concedes the trial court extensively interrogated potential jurors about their exposure to pretrial publicity, but he argues they weren't adequately admonished nor would it be possible to "purge" their knowledge of the "serial killer" allegations against Gibson. Appellant's Br. at 36–37. Thus, he says, the entire panel should have been dismissed or the court should have sua sponte declared a mistrial. In seeking such relief, Gibson relies on Lindsey v. State, which held that if a sworn jury is exposed to prejudicial out-of-court material, the exposed jurors should be individually interrogated and admonished, but where the court believes "the peril to be substantial and uncurable," it should declare a mistrial. 260 Ind. 351, 358, 295 N.E.2d 819, 824 (1973).

Here, however, we are not dealing with an empaneled jury, but *potential* jurors whose preconceived ideas and biases were thoroughly examined by the parties during voir dire. Indeed, it was through their meticulous questioning that any potential jurors who were aware of the other murders were excluded. As for those who responded they lacked any outside knowledge of the case, we presume they answered truthfully. Brown v. State, 563 N.E.2d 103, 105 (Ind. 1990). Because Gibson points to no sworn juror[1]—and we find none—who should have been disqualified due to exposure to pretrial publicity, we see no error.

---

[1] In his Addendum, Gibson lists 75 potential jurors who indicated they learned something about the case on the radio or internet. In bold, he identifies three that actually served as jurors. Although not referenced in his Appellant's Brief, to the extent Gibson argues those three jurors should have been excluded based on their

### III. The Trial Court Did Not Abuse Its Discretion in Denying Gibson's Request to Ask a Case-Specific Question During Voir Dire.

During the first phase of voir dire, which principally aimed to death-qualify the jury, Gibson's counsel began asking potential jurors a hypothetical question that included specific facts of this case.[2] The State objected, and the trial court sustained, commenting that questions relating to the case may be appropriate during the second phase. Then, at the beginning of the second phase, defense counsel asked permission to ask:

> In a case where defendant is . . . found guilty of sexually assaulting and murdering an elderly woman, what are their views on the death penalty, and could they consider relative mitigation, and the mitigation listed [in the statute] and any other fact the juror may consider as necessary.

Tr. at 2428. The trial court denied permission, concluding the question improperly asked jurors what their ultimate sentencing recommendation would be, given the case-specific aggravators before them.

Gibson now argues his questions should have been permitted so he could determine if a juror might automatically choose the death penalty when hearing there was a sexual attack and dismemberment of an elderly woman. The State responds Gibson was not prohibited from asking about such biases; it simply could not give the specific facts of this case and then ask jurors how they

---

exposure to pretrial publicity, we note he did not challenge them for cause, and thus waives our review. And, in any event, our review of the record shows their exposure was minimal and gives us no reason to believe they could not render an impartial verdict.

[2] "Now, assume each of you are part of a jury, that you and 11 others have deliberated, all right, and you have heard all the evidence, and you have decided beyond a reasonable doubt that this hypothetical defendant sexually assaulted, and intentionally in cold blood murdered an innocent elderly woman and then dismembered her body. Are you following me so far?" Tr. at 547.

would decide. And, in any event, given the extensive questioning during voir dire, any error was harmless.

"Trial courts have broad discretionary power in regulating the form and substance of voir dire." Logan v. State, 729 N.E.2d 125, 133 (Ind. 2000). We thus review a trial court's management of voir dire for "manifest abuse of discretion," requiring a showing of prejudice to warrant reversal. Id.

The purpose of voir dire is to ascertain whether prospective jurors can render an impartial verdict based upon the law and the evidence, Von Almen v. State, 496 N.E.2d 55, 59 (Ind. 1986), and "weed out" those who show they cannot be fair to either side. Burris v. State, 465 N.E.2d 171, 179 (Ind. 1984). Thus, the parties may "inquire into jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about a particular line of defense." Hopkins v. State, 429 N.E.2d 631, 634–35 (Ind. 1981) (finding no error where jurors were asked whether they would disbelieve a witness that entered into a plea bargain). It is also well-established that, in capital cases, defendants must be allowed to ask potential jurors about their beliefs regarding the death penalty. Morgan v. Illinois, 504 U.S. 719, 736 (1992).

But, questions should be limited to "testing the capacity and competency of prospective jurors." Skaggs v. State, 438 N.E.2d 301, 304 (Ind. Ct. App. 1982). Those that "seek to shape the favorable jury by deliberate exposure to the substantive issues in the case" are not permitted. Davis v. State, 598 N.E.2d 1041, 1047 (Ind. 1992) (affirming trial court's disallowing defense counsel from essentially asking prospective jurors "how they would vote in the present case").

We find no manifest abuse of discretion in the trial court's boundaries of voir dire. Indeed, the limitation here was quite minimal: similar to Davis, the trial court merely ruled defense counsel could not "give the jury pool the specific facts of the case and then ask them what their verdict would be." App. at 700. Gibson was not denied the opportunity to make reasonable inquiry into juror attitudes about the death penalty, elderly victims, or sexual assault.

8

Because this particular question went beyond exploring juror biases by asking jurors to make a decision without the benefit of the evidence, the trial court did not err in disallowing it.

## IV. The Trial Court Did Not Abuse Its Discretion in Denying Gibson's For-Cause Juror Challenges.

Gibson contends there are six jurors that should have been removed for cause, and since he ultimately used all of his peremptory challenges, he was "forced to accept other jurors who, although not necessarily excludable for cause, were impermissibly biased." Appellant's Br. at 48. Before considering the merits of Gibson's for-cause challenges, however, we must first determine whether they are reviewable.

To preserve appellate review of for-cause challenges, a defendant must comply with the exhaustion rule, which requires he peremptorily remove jurors whom the trial court refused to strike for cause or show he had already used his peremptories at the time he requested for-cause removal. Oswalt v. State, 19 N.E.3d 241, 247 (Ind. 2014). Then, the defendant must show he was forced to accept either an incompetent juror (one who should have been dismissed for cause) or an objectionable juror (one whom he would have peremptorily stricken, had he not been forced to use up his peremptory strikes on jurors that should have been stricken for cause). Id. at 249.

Here, although Gibson moved to dismiss Juror 4514 for financial hardship during the first phase of voir dire, which was initially denied, the court later excused him[3] without Gibson needing to use a peremptory strike. Also during the first phase, Gibson unsuccessfully moved to dismiss Juror 4709, Juror 4865, and Juror 5128, so they moved on to the second phase. But,

_____

[3] The record is unclear why Juror 4514 was excused.

9

those three never made it into the jury box for questioning before the jury was actually empaneled, so they were sent home without costing Gibson any peremptory strikes. Because Gibson did not have to exercise strikes on these four prospective jurors that did not serve on his jury, we need not review his motions to dismiss them for cause.

Gibson did peremptorily strike Juror 5081 and Juror 5113, so we will consider the merits of those two for-cause challenges.

A juror should be excused for cause if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Dye v. State, 717 N.E.2d 5, 16 (Ind. 1999) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). Because such biases can be difficult to ascertain on a paper record, we pay considerable deference to the trial judge, who has the unique opportunity to "assess the demeanor of prospective jurors as they answer the questions posed by counsel." Oswalt, 19 N.E.3d at 245. We thus review the court's ruling on a for-cause challenge for an abuse of discretion. Id.

In his questionnaire, Juror 5081 said life imprisonment without the possibility of parole is not a severe enough punishment for murder, but during voir dire by the State he said he could consider it. When defense counsel questioned him, however, Juror 5081 indicated he could *not* seriously consider it. He later added, "my opinion's not changed, but I would weigh the facts as given to me." Tr. at 1514. After Gibson's motion to dismiss, the judge asked Juror 5081 his views, this time with the benefit of further explanation:

> If the defendant is found guilty, the trial then moves to the second phase, as I explained, and that is the sentencing for the penalty phase. There the State of Indiana has alleged some aggravating circumstances, and they have the burden to prove that beyond a reasonable doubt. The defense can present mitigating factors, either challenge those aggravators or just present mitigating factors for you to consider. As a juror you would weigh the aggravators and the mitigators and recommend to me the sentence for the defendant, and that's a sentence that I am obligated to follow. Your recommendation would be either the death penalty or life imprisonment without parole or to be sentenced to a term of years.

10

And the question is, are you able to consider those three possibilities, or are you of such a state of mind that you could not?

Tr. at 1520–21. Juror 5081 answered, "Yes, ma'am, I could." Tr. at 1521. The court denied Gibson's motion, and he used a peremptory.

Although Juror 5113 said her opinion would not be swayed by the fact the case involved an elderly victim, she later added, "I think I may have a problem with an elderly victim," calling them "defenseless." Tr. at 2493. When the defense moved to dismiss for cause, the State had the opportunity to further question Juror 5113, who said, "I don't know anything about this case at all, other than what I've heard here, so I would certainly intend to be as honest and impartial as I could be." Tr. at 2504. She ultimately summed up her feelings, stating, "I think I can sort through the evidence, and I would be as fair and honest as I could possibly be. Knowing the victim was elderly or a child, it would bother me. And that's the best I can say." Tr. at 2505. The court denied Gibson's motion, noting the court would expect that to bother everyone but thought Juror 5113 could set that aside and fairly listen to the evidence. Gibson used a peremptory strike to excuse Juror 5113.

We find the trial court was within its discretion in denying Gibson's motions to dismiss these jurors for cause. Although Juror 5081 was not perfectly consistent in his responses as to the appropriate penalty for murder, he did consistently answer that he would weigh the evidence and dutifully follow the law as instructed. And even though Juror 5113 expressed some discomfort with an elderly victim, she too pledged to fairly consider the evidence. The trial court observed these jurors' assurances of impartiality, and we will not second guess its determination that they were sincere.

### V. The Trial Court Did Not Abuse Its Discretion in Declining to Instruct the Jury on Voluntary Manslaughter.

At trial, Gibson offered evidence that he did not intend to kill Whitis; instead, he was drunk, grief-stricken, and when she rejected him, he "just flipped out." Ex. 11 at 281. He

requested an instruction on voluntary manslaughter, but the trial court rejected it. On appeal, Gibson argues that despite pressure from police, he remained firm in his position that he did not mean to kill Whitis. He contends his statements to police are sufficient to establish the possibility of sudden heat for the jury's consideration. The State responds that this was not a rejected sexual advance; rather, Gibson attacked Whitis. Even if it were an advance, there is no authority that suggests such a rejection could constitute provocation of sudden heat. And, according to the State, the uncontroverted evidence shows the murder was not sudden; Gibson manually strangled Whitis for several minutes, in addition to inflicting multiple other injuries before and after her death.

A voluntary manslaughter instruction should be given if there is "appreciable evidence" of sudden heat. Stevens v. State, 691 N.E.2d 412, 426 (Ind. 1997). Sudden heat is "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." Washington v. State, 808 N.E.2d 617, 625–26 (Ind. 2004). This standard is an objective one. Wilson v. State, 697 N.E.2d 466, 474 (Ind. 1998) (stating sudden heat contemplates an ordinary person, not one afflicted with post-traumatic stress disorder). Thus, words alone are not sufficient provocation. Matheney v. State, 583 N.E.2d 1202, 1205 (Ind. 1992). We review the refusal to instruct the jury on voluntary manslaughter for an abuse of discretion. Washington, 808 N.E.2d at 626. And we will not reverse absent a "serious evidentiary dispute" as to sudden heat. Wilson, 697 N.E.2d at 474.

We find no record evidence here supporting Gibson's claim of sudden heat. Even if we were to characterize his shoving his hand up Whitis's shirt and grabbing her breast as a "sexual advance," her resistance—asking him what his mother would think—simply cannot be sufficient provocation to support an involuntary manslaughter instruction. No ordinary person would be rendered incapable of reflection based on such circumstances. Indeed, Gibson's own expert testified that Whitis's statement may have set him off "in ways that it wouldn't set off a normal person." Tr. at 3652. Accordingly, we conclude the trial court properly refused Gibson's tendered instruction on voluntary manslaughter.

12

**VI. Gibson's Sentence of Death Is Not Inappropriate.**

This Court may revise a sentence if it is "inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The purpose of our review is not to reach what we perceive to be a "correct" sentence but merely to "leaven the outliers." Knapp v. State, 9 N.E.3d 1274, 1292 (Ind. 2014). Because sentencing is a highly case-sensitive endeavor, we recognize it is generally a decision best made at the trial court level. See Saylor v. State, 808 N.E.2d 646, 649 (Ind. 2004).

Gibson argues the death penalty is not appropriate because defendants in other cases with similar facts have received a term of years. The State points out that none of those cases were instances in which this Court was asked—let alone accepted the invitation—to revise a sentence that was based on a jury's recommendation.[4] In any event, Rule 7(B) does not require us to compare Gibson's sentence with sentences of other offenders but rather to duly consider the nature of offense and character of the offender before us today. In doing so, we find the nature of Gibson's offense to be beyond horrendous: he brutally murdered an elderly woman, sexually assaulting her in the process, even after she was dead, then dismembering her body. As for his character, Gibson has an extensive criminal history. And although we understand he is afflicted with various mental disorders and grief over his mother's death, no one testified he was unable to appreciate the severity of his crime. Gibson's jury heard this evidence and more, determined the State proved all four aggravators beyond a reasonable doubt, and found those aggravators outweighed the mitigating

---

[4] Henry v. State, 738 N.E.2d 663, 664 (Ind. 2000) (affirming conviction where trial court sentenced defendant to 65 years); Lee v. State, 545 N.E.2d 1085, 1086–87 (Ind. 1986) (affirming conviction where trial court sentenced defendant to 60 years); Heald v. State, 492 N.E.2d 671, 674 (Ind. 1986) (affirming convictions where trial court sentenced defendant to 40 and 30 years concurrent); Kimble v. State, 270 Ind. 539, 540, 387 N.E.2d 64, 64 (1979) (affirming convictions where trial court sentenced defendant to life and 20 years); Williams v. State, 811 N.E.2d 462, 463 (Ind. Ct. App. 2004) (remanding for resentencing in a felony murder case where the trial court sentenced defendant to 60 years but improperly considered his race as an aggravating circumstance).

evidence presented.[5] In light of the horrific manner in which Gibson took Whitis's life and his lack of redeeming character traits, we find this is not the kind of exceptional case that warrants appellate modification of a sentence. Finding Gibson's sentence of death was not inappropriate, we decline to revise it.[6]

**Conclusion**

For the foregoing reasons, we affirm.

Rush, C.J., Dickson, Rucker, and David, JJ., concur.

---

[5] Gibson argues there is no record evidence the jury meaningfully considered his mitigators. We do not require juries to explain how they weighed a defendant's mitigating evidence. Weisheit v. State, 26 N.E.3d 3, 20 (Ind. 2015), reh'g denied. Absent evidence to the contrary, we generally presume the jury follows the trial court's instructions in reaching its determination. Id. Seeing no reason to second-guess the jury followed the court's comprehensive penalty phase instructions, we find Gibson's argument on this point unavailing.

[6] Gibson also argues his sentencing order does not meet the heightened standards for death penalty cases pursuant to Harrison v. State, 644 N.E.2d 1243, 1262 (Ind. 1995). But the order he describes is no longer required when, as here, the jury recommends a death sentence and the trial court sentences the defendant accordingly. E.g., Weisheit, 26 N.E.3d at 20; Pittman v. State, 885 N.E.2d 1246, 1254 (Ind. 2008).