## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 04 2016, 6:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Darreus Rainwater,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 4, 2016<br><br>Court of Appeals Case No.<br>28A01-1507-CR-830<br><br>Appeal from the Greene Superior Court<br><br>The Honorable Dena Martin, Judge<br><br>Trial Court Cause No.<br>28D01-1503-F5-9 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Darreus Rainwater and a friend broke into a garage in order to take four-wheelers, but the homeowners came home and thwarted their plans. Rainwater's friend entered into an agreement with the prosecutor and testified against Rainwater at trial. Rainwater was convicted of Level 5 felony burglary and Class A misdemeanor attempted theft, and the trial court sentenced him to an aggregate term of five years with two years suspended.

[2] Because the State concedes that there is a double-jeopardy violation, we remand this case to the trial court with instructions to vacate Rainwater's conviction and sentence for Class A misdemeanor attempted theft. Even assuming that the prosecutor committed prosecutorial misconduct during voir dire and closing argument, we conclude that Rainwater has failed to establish that the instances—either individually or cumulatively—constitute fundamental error. Finally, Rainwater has failed to persuade us that his sentence is inappropriate.

# Facts and Procedural History

[3] In March 2015 Chad Hall lived with his father and fifteen-year-old son in Greene County, Indiana. Hall kept four four-wheelers and lawn equipment inside a detached garage on the property.

[4] Hall and his son were returning home around 6:00 p.m. one evening when Hall's son said that he saw something in the detached garage. Hall drove his truck to the detached garage and walked toward the service door, which was on

the side of the garage. At about the same time, Rainwater and Christopher Porter exited the garage and went in opposite directions. Hall recognized Porter from an incident a couple years before, but he did not recognize Rainwater. Hall grabbed Rainwater, who was closest to him, by the back of his shirt, and Porter ran away. As Rainwater turned around, his elbow went up in Hall's direction, so Hall punched him in the face. Rainwater fell to the ground, where Hall then kicked him. Hall helped Rainwater find his glasses and then told him to "get lost and don't come back." Tr. p. 205. Rainwater and Porter met back up down the road.

[5] In order to explain the mark that Hall had left to his face, Rainwater told his girlfriend's mother, with whom he and Porter lived, that he and Porter had gotten into a fight with a friend. The girlfriend's mother then overheard Rainwater tell Porter to "not say a fu**ing word" and "keep his fu**ing mouth shut." *Id.* at 339. Rainwater also told his girlfriend about the earlier events. Although Rainwater wavered between whose idea it was to take the four-wheelers, he said that Porter was scared to open the door to the detached garage, so he put his sleeve over his hand and opened the door.

[6] After talking with his father, Hall decided to call the police. The police arrested Rainwater and Porter later that night. When the police spoke with Porter, he told them that he thought the detached garage was his cousin's house. But when the police did not believe Porter, he changed his story. Porter then told the police that it was Rainwater's idea to go inside the garage and take the four-wheelers. In exchange for a three-year sentence with two years suspended for

Level 5 felony burglary, Porter agreed to testify against Rainwater at trial. Ex. 2 ("The Defendant agrees to testify truthfully at any hearing, deposition or trial involving co-defendant.").

[7] The State charged Rainwater with Level 5 felony burglary and Class A misdemeanor attempted theft. During voir dire, the prosecutor asked the prospective jurors if they could give Porter the benefit of the doubt, just like they would a police officer, even though he pled guilty to this crime as well. Porter testified at trial that he and Rainwater were walking to a friend's house when Rainwater suggested breaking into the detached garage on the Hall property and taking the four-wheelers. Porter said that Rainwater used his sleeve to open the service door to the garage. Porter testified that they were in the garage looking for keys to the four-wheelers for less than five minutes when the Halls pulled up. As Hall approached the service door to the garage, Rainwater and Porter came out and Porter took off running. Porter testified that as he ran away, he saw Hall hit Rainwater.

[8] Rainwater testified to a different version of events. He claimed that Porter told him that the detached garage was his cousin's house and that he did not know about any plan to take the four-wheelers until Porter told him when they met back up down the road. During closing argument, the prosecutor implied— without any evidence in the record—that Porter put himself in danger by agreeing to testify for the State and therefore should be believed. The jury found Rainwater guilty of Level 5 felony burglary and Class A misdemeanor attempted theft.

[9] At sentencing, defense counsel did not present any evidence but rather argued that—as reflected in the PSI—there were several mitigators, including that Rainwater was only nineteen years old; he had several mental-health diagnoses, including ADHD, bipolar disorder, and PTSD; he abused Xanax and alcohol; and he was abused as a child. The trial court found the following mitigators: Rainwater's age and mental-health diagnoses. The court found the following aggravators: Rainwater's juvenile and adult criminal history, the fact that he was on probation when he committed this offense, and his behavior in jail. The court then sentenced Rainwater to five years with two years suspended for burglary and one year for attempted theft, to be served concurrently (notwithstanding the State's acknowledgement of a double-jeopardy violation, *see* Tr. p. 446). In addition, the court placed Rainwater in the Purposeful Incarceration Program, noting that upon Rainwater's successful completion of the program, it "would consider a modification of [his] sentence." *Id.* at 453. It was the court's hope that Rainwater would "figure out what [he] need[ed] to do to abide by society's rules." *Id.*

[10] Rainwater now appeals.

# Discussion and Decision

[11] Rainwater raises three issues on appeal. First, he contends that his convictions for burglary and attempted theft violate the actual-evidence test of Indiana's double-jeopardy clause. Second, Rainwater contends that the prosecutor

engaged in misconduct during voir dire and closing argument. Last, he contends that his sentence is inappropriate.

# I. Double Jeopardy

[12] Rainwater contends that his convictions for burglary and attempted theft violate the actual-evidence test of Indiana's double-jeopardy clause. The State concedes this issue. *See* Appellee's Br. p. 14 ("[T]he State's evidence proving Attempted Theft entirely subsumed the proof of Level 5 felony Burglary."). We therefore remand this case to the trial court with instructions to vacate Rainwater's conviction and sentence for Class A misdemeanor attempted theft. *See Morrison v. State*, 824 N.E.2d 734, 741-42 (Ind. Ct. App. 2005) ("[A] double jeopardy violation occurs when judgments of conviction are entered and cannot be remedied by the 'practical effect' of concurrent sentences or by merger after conviction has been entered."), *trans. denied*.

# II. Prosecutorial Misconduct

[13] Rainwater next contends that the prosecutor engaged in misconduct during voir dire and closing argument. In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred and, if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been subjected otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied*. Whether a prosecutor engages in misconduct is measured by reference

to case law and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury and, if further relief is desired, move for a mistrial. *Id.*

[14] Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court. *Id.* The defendant must establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error. *Id.* at 667-68. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* at 668. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not sua sponte raising the issue because the alleged errors (1) constitute clearly blatant violations of basic and elementary principles of due process and (2) present an undeniable and substantial potential for harm. *Id.*

[15] Rainwater concedes that defense counsel did not object at trial and therefore he must establish that the prosecutorial misconduct constituted fundamental error. *See* Appellant's Br. p. 12.

# A. Voir Dire

[16] Rainwater argues that the prosecutor committed misconduct during voir dire. The purpose of voir dire is not to educate prospective jurors but rather to ascertain whether they can render an impartial verdict based upon the law and the evidence and "weed out" those who show they cannot be fair to either side. *Gibson v. State*, 43 N.E.3d 231, 238 (Ind. 2015) (quotation omitted); *Coy v. State*, 720 N.E.2d 370, 372 (Ind. 1999). Accordingly, the parties may inquire into jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about a particular line of defense. *Gibson*, 43 N.E.3d at 238; *Hopkins v. State,* 429 N.E.2d 631, 634-35 (Ind. 1981) (finding no error where jurors were asked whether they would disbelieve a witness who entered into a plea bargain).

[17] But questions should be limited to "testing the capacity and competency of prospective jurors." *Gibson*, 43 N.E.3d at 238 (quotation omitted). Those questions that "seek to shape the favorable jury by deliberate exposure to the substantive issues in the case" are not permitted. *Id.*; *Davis v. State*, 598 N.E.2d 1041, 1047 (Ind. 1992) (affirming trial court's disallowing defense counsel from essentially asking prospective jurors "how they would vote in the present case"), *reh'g denied*.

[18] Rainwater first asserts that the prosecutor crossed the line by asking the prospective jurors to prejudge Porter's credibility:

[Prosecutor]: . . . Let's talk a little bit about Mr. Porter. He's already pled guilty. He . . . signed a plea agreement and he c[a]me in court and ple[]d guilty. He's going to come in here and testify. Do you think that his testimony should be held to a lesser standard? Would you believe him less just because he's a co-defendant in this case? You would, would you believe him less?

Juror: Probably a little bit.

[Prosecutor]: Okay, why's that?

Juror: Just because he committed [t]he crime as well.

* * * * *

[Prosecutor]: Would you agree to at least . . . give him the benefit of the doubt?

Juror: Probably.

[Prosecutor]: And, and think about . . . what motivation he has to lie, if any, in this case, [because he's] already taken responsibility for this case. Does that make sense?

Juror: I'd want to know . . . if the prosecut[or] made a deal with him.

[Prosecutor]: . . . We have . . . a duty to give you the plea agreement . . . . [W]e made a deal with him, just like we do with most people. I mean you can't, you have to get witnesses from somewhere, right? Would you agree with that, sir? . . . If I could bring in a row of nuns to testify in a criminal case, believe me, I would. . . .

Tr. p. 26-27.

[19] Here, the prosecutor properly inquired about the prospective jurors' predispositions to believe or disbelieve Porter because he had made a plea bargain with the State. *See Gibson*, 43 N.E.3d at 238; *Hopkins*, 429 N.E.2d at 635 ("We see nothing wrong in inquiring into jurors' minds about their biases in regard to the credibility of witnesses with an eye toward removing prospective jurors predisposed to disbelieve those with certain characteristics, such as plea bargainers."). However, the prosecutor went too far by giving the prospective jurors his personal take of how the plea agreement affected Porter's credibility. *See also* Tr. p. 106 ("Do you agree to give [Porter] the same benefit of the doubt as you would any other witness? . . . Just like you would a police officer . . . ."). Nevertheless, we find that this line of questioning did not place Rainwater in a position of grave peril.

[20] Rainwater next asserts that the prosecutor committed misconduct by addressing the topic of reasonable doubt with the prospective jurors:

> [Prosecutor]: . . . Do you think the State can prove and connect all of these dots based upon the testimony of the people that were there?
>
> #658: I believe so.
>
> * * * * *
>
> [Prosecutor]: And if the State proves this charge beyond a reasonable doubt, you think you can convict Mr. Rainwater?

#658: Yes.

*Id.* at 43-44; *see also id.* at 23 ("Do all of you think that if the State proves the charge beyond a reasonable doubt that you could vote to convict Mr. Rainwater?"); 30 (discussing reasonable-doubt standard); 37 ("If the State proves this charge beyond a reasonable doubt, you think you can convict Mr. Rainwater?"); 39 ("If I can prove this trial beyond a reasonable doubt, you think you could convict the defendant? . . . You promise to do so by proof beyond a reasonable doubt?").

[21] It is improper to ask prospective jurors how they would vote. *See Gibson*, 43 N.E.3d at 238; *Davis*, 598 N.E.2d at 1047; *Perryman v. State*, 830 N.E.2d 1005, 1010 (Ind. Ct. App. 2005) (noting that it is improper "to examine jurors as to how they would act or decide in certain contingencies or in case certain evidence should be developed . . . at trial"). However, it is permissible for the prosecutor to ask the prospective jurors questions to determine whether they understand reasonable doubt and are capable of rendering a verdict in accordance with the law. *Barber v. State*, 715 N.E.2d 848, 850 (Ind. 1999). Here, the prosecutor's questions were directed to whether the prospective jurors understood the concept of reasonable doubt, not to how they would vote given the evidence. We therefore find no misconduct.

# B. Closing Argument

[22] Rainwater next argues that the prosecutor committed misconduct during closing argument by implying—without any evidence in the record—that Porter

put himself in danger by agreeing to testify for the State, which enhanced his credibility:

> You think Mr. Porter is a popular guy at the jail right now? You think snitches are popular men at the jail? So again, I ask you, what possible motivation he has to come in here and lie other than if he simply really does want to turn his life around like he said. He's still got to serve several more months in the jail with those folks. And you think there's secrets in the jail? There ain't no secrets in the jail. . . . And it wouldn't have changed his punishment had he come in here and said, it was all my idea, I[] masterminded this thing, I masterminded this heist. . . . His life would have been so much better off in the jail if he'd said that. But he didn't.

Tr. p. 411-12.

[23] The Indiana Rules of Professional Conduct demand that a lawyer "shall not . . . in trial[] allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." Ind. Professional Conduct Rule 3.4(e). Indiana courts have emphasized the impropriety of this trial tactic. *See, e.g., Benson v. State*, 762 N.E.2d 748, 752 (Ind. 2002).

[24] Here, there was no evidence in the record about how Porter was treated or going to be treated in jail because he agreed to testify for the State.[1]

---

[1] The State tried to admit evidence that Rainwater had attacked Porter in jail, but the trial court excluded this evidence. Tr. p. 292.

Nevertheless, the prosecutor implied that Porter put himself in danger by agreeing to testify for the State, which in turn implied that Porter must be telling the truth given the risk to him. This was improper. *See id.* ("[T]he prosecutor's questions and evidence did not directly allege that the witness was fearful due to threats connected to the defendant, but did clearly imply, without any substantiating foundation in the record, that the witness's trial testimony was untruthful due to his fear of retribution. . . . [W]e cannot approve of the questioning permitted here.").

## C. Fundamental Error

[25]     Even assuming that these instances amounted to prosecutorial misconduct, Rainwater is still not entitled to relief.[2] In evaluating this issue using the fundamental-error doctrine, our task is to "look at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions— to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." *Ryan*, 9 N.E.3d at 668. We do not believe that the prosecutor's statements—which mostly concerned the credibility of Porter—had an undeniable and substantial effect on the jury's

---

[2] Rainwater claims that the prosecutor engaged in other instances of misconduct. For example, he argues that the prosecutor improperly asked the prospective jurors during voir dire not to get "caught up" with matters that did not affect the elements of the crime, such as the weather on the day of the crime. Tr. p. 32. He also claims that the prosecutor improperly argued during closing argument that he could have given Porter immunity. *Id.* at 399. We find no misconduct in either example. But even if we found that these instances amounted to prosecutorial misconduct, they do not constitute fundamental error.

decision such that a fair trial for Rainwater was impossible. This is because there was evidence in addition to Porter's testimony that linked Rainwater to the burglary. Hall and his son identified Rainwater as one of the two men leaving their detached garage. After being caught, Rainwater raised his elbow at Hall. Rainwater then fabricated a story about a fight to his girlfriend's mother in order to explain the mark that Hall had left to his face. Rainwater also told Porter not to tell anyone what happened. Finally, Rainwater told his girlfriend that he opened the service door to the detached garage by using his sleeve; this is precisely how Porter testified at trial that Rainwater opened the door. Accordingly, we find that the instances—either individually or cumulatively—did not make a fair trial for Rainwater impossible.

# III. Inappropriate Sentence

[26] Last, Rainwater contends that his five-year sentence with two years suspended and placement in the Purposeful Incarceration Program for Level 5 felony burglary is inappropriate. A person who commits a Level 5 felony "shall be imprisoned for a fixed term of between one (1) and six (6) years, with the advisory sentence being three (3) years." Ind. Code § 35-50-2-6(b). Rainwater asks us to "revise his sentence to . . . the advisory sentence of three years." Appellant's Br. p. 11.

[27] The Indiana Constitution authorizes independent appellate review and revision of the trial court's sentencing decision. *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014). We implement this authority through Indiana Appellate Rule 7(B),

which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Id.* When reviewing the appropriateness of a sentence under Appellate Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended or "crafted using any of the variety of sentencing tools available to the trial judge." *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010).

[28] There is nothing particularly egregious about this offense. Rainwater and Porter broke and entered a detached garage with the intent of taking four-wheelers but ended up taking nothing because the homeowners came home.

[29] Rainwater's character, however, supports the trial court's carefully crafted sentence. Since 2011, the nineteen-year-old Rainwater had been adjudged a delinquent five times (including one adjudication for theft), was convicted of Class A misdemeanor criminal trespass as an adult, and was on probation at the time of this offense. In addition, Rainwater violated probation in 2013. While in the Greene County Jail for three months awaiting trial in this case, Rainwater committed three violations: he attacked Porter and he committed two "less serious violations that seem to show a continuing problem of being unable to follow . . . the rules . . . ." Appellant's App. p. 198. Also, while in the Monroe County Jail in 2014 for his Class A misdemeanor conviction,

Rainwater received thirty days of lock down for tampering with locks. *Id.* at 181.

[30] While we acknowledge that Rainwater is young and has some mental-health diagnoses, he has failed to persuade us that his five-year sentence with two years suspended and placement in the Purposeful Incarceration Program (with a chance to modify his sentence) is inappropriate given his juvenile and adult criminal history, probation violations, and behavior in jail. We therefore affirm Rainwater's sentence.[3]

[31] Affirmed in part, and reversed and remanded in part.

Bailey, J., and Crone, J., concur.

---

[3] Rainwater appears to tack on a new argument to the end of his inappropriate-sentence argument. *See* Appellant's Br. p. 11. That is, he appears to argue that he was punished for exercising his constitutional right to a jury trial because his sentence is longer than Porter's sentence. Although it is constitutionally impermissible for a trial court to impose a more severe sentence because the defendant has chosen to stand trial rather than plead guilty, *see Walker v. State*, 454 N.E.2d 425 (Ind. Ct App. 1983), *reh'g denied*, there is no evidence in the record that suggests such a violation occurred here.