## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2018, 7:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald J. Moore
The Moore Law Firm, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Frank James,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 5, 2018

Court of Appeals Case No.
89A01-1709-CR-2110

Appeal from the
Wayne Superior Court

The Honorable
Gregory A. Horn, Judge

Trial Court Cause No.
89D02-1705-F5-62

**Kirsch, Judge.**

[1] Frank James ("James") was convicted after a jury trial of burglary[1] as a Level 5 felony and was adjudicated a habitual offender.[2] The trial court sentenced him to an aggregate sentence of eight years executed. James appeals and raises the following restated issues for our review:

> I. Whether James knowingly and voluntarily waived his right to counsel; and

> II. Whether the prosecutor committed prosecutorial misconduct in voir dire when he asked the potential jurors how they felt about a defendant who chooses to represent himself.

[2] We affirm.

## Facts and Procedural History

[3] James and Bambi Runyon ("Runyon") lived together in an apartment on Main Street in Richmond, Indiana. On May 11, 2017, at around 3:00 a.m., James and Runyon walked past Sander's Jewelers on Main Street, both turning to look in the store window at a piece of jewelry as they walked by the store. Approximately fifteen minutes later, at 3:25 a.m., Runyon walked past on the other side of the street, and James returned to the jewelry store and stood in front of the store. For almost a minute, James carefully looked all around, and

---

[1] *See* Ind. Code § 35-43-2-1.

[2] *See* Ind. Code § 35-50-2-8.

at one point, he appeared to reach into his pocket. James then reared back and threw a rock through the store window. James reached inside the window and then walked away.[3]

[4] The owner of the jewelry store was notified that the glass break detector at the store had been activated and that the alarm was going off. He drove to the store where he found the window had been shattered and a large rock was inside. The owner determined that a ladies' moonstone ring, valued at $150.00 and located in the area where the window was broken, was missing. Several people familiar with James identified him as the person shown in the jewelry store surveillance video that captured the incident. *Tr.* at 108, 111, 125-27, 129, 135-36.

[5] The State charged James with Level 5 felony burglary and alleged that he was a habitual offender. A jury trial was held, and at the start of the first day of trial, James expressed a desire to represent himself because he was dissatisfied with his attorney. *Id.* at 16-17. The trial court then inquired into James's educational background and warned him that: (1) he would receive no special treatment and would be held to the same standards as an attorney; (2) the State would be represented by a skilled attorney; (3) his attorney had skills and

---

[3] Although the angle of the surveillance video did not clearly show James reaching in through the glass, James can be seen on the video moving toward the window and making movements clearly consistent with a person reaching his arm through and trying to pull something out. The store owner also testified that the shattered glass in the window was pulled back toward the outside, which suggested that a hand had pulled back out through the opening. *Tr.* at 101.

expertise and knew how to do many things that were necessary in a trial that James did not; and (4) it was not in James's best interests to proceed pro se. *Id.* at 17-19. Despite hearing all this, James still maintained that he wanted to represent himself, and the trial court granted his request. *Id.* at 20. After the prosecutor questioned the first panel of jurors during voir dire, James informed the trial court that he had changed his mind and wished to have an attorney represent him. The trial court re-appointed counsel for James, and the appointed counsel handled the trial proceedings from that point forward, including the voir dire questioning for that first panel of jurors. At the conclusion of the trial, the jury found James guilty of burglary, and James admitted to being a habitual offender. The trial court sentenced James to an aggregate term of eight years executed. James now appeals.

## Discussion and Decision

## I.    Waiver of Right to Counsel

[6] James contends that the trial court erred when it allowed him to proceed pro se during the voir dire portion of his trial because his waiver of the right to counsel was not knowing, intelligent, and voluntary. He asserts that his waiver of the right to counsel was equivocal because, although he was clear in his initial assertion of his desire to proceed pro se, he later waffled in that desire. James claims that his later statements show that he did not appreciate the dangers of self-representation. He further argues that he did not have the experience or education to proceed pro se, and the context of his request – namely, that he was upset with his appointed counsel and waited until the morning of trial to

request to go pro se, which made him unprepared to continue – show that his request to represent himself should have been denied.

[7] "The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to counsel before he may be tried, convicted, and punished." *Hopper v. State*, 957 N.E.2d 613, 617-18 (Ind. 2011) (citing *Faretta v. California*, 422 U.S. 806, 807 (1975)). This protection also encompasses an affirmative right for a defendant to represent himself in a criminal case. *Milian v. State*, 994 N.E.2d 342, 348 (Ind. Ct. App. 2013), *trans. denied*. However, "in most criminal prosecutions, defendants 'could better defend with counsel's guidance than by their own unskilled efforts.'" *Id*. (quoting *Hopper*, 957 N.E.2d at 617-18). When a defendant waives his right to counsel and proceeds to trial unrepresented, the record must reflect that the right to counsel was voluntarily, knowingly, and intelligently waived. *Hart v. State*, 79 N.E.3d 936, 939 (Ind. Ct. App. 2017). Whether there has been an intelligent waiver depends on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. *Id*. The defendant should be made aware of the dangers and disadvantages of self-representation, so that that the record will establish that "'he knows what he is doing and his choice is made with eyes open.'" *Hopper*, 957 N.E.2d at 618 (quoting *Faretta*, 422 U.S. at 835).

[8] There is no particular formula or script that must be read to the defendant. *Id*. "The information that must be given 'will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or

easily grasped nature of the charge, and the stage of the proceeding.'" *Id.* (quoting *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)). In determining whether the right to counsel was validly waived, Indiana courts must consider: (1) the extent of the court's inquiry into the defendant's decision; (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to proceed pro se. *Taylor v. State*, 944 N.E.2d 84, 90 (Ind. Ct. App. 2011) (citing *Poynter v. State*, 749 N.E.2d 1122, 1127-28 (Ind. 2001)).

[9] We review the trial court's conclusion that a defendant knowingly and voluntarily waived the right to counsel de novo. *Hart*, 79 N.E.3d at 940 (citing *R.W. v. State*, 901 N.E.2d 539, 543 (Ind. Ct. App. 2009)). It is the trial court who is in the best position to assess whether a defendant has knowingly and intelligently waived counsel. *Taylor*, 944 N.E.2d at 90. Therefore, "'we will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and voluntariness of his decision.'" *Id.* (quoting *Poynter*, 749 N.E.2d at 1128). On appeal, we will review the record to evaluate the trial court's inquiry and reasoning in reaching its conclusion. *Id.*

[10] In the present case, James was not pleased with his counsel over issues related to the preparation of his defense, and their relationship was very contentious. *Tr.* at 12-13. James told the trial court that he felt "strongly" that he wished to

proceed without his appointed counsel and would rather "go pro se," and he felt that he could do a better job "all by himself." *Id*. at 16. The trial court warned James that his requested speedy trial was going to start that day and that he was not going to receive another attorney, but James stated that he still wished to proceed on his own. *Id*. at 16-17. The trial court then inquired into James's educational background. *Id*. at 17. The trial court warned James that he might conduct a defense to his own detriment, that he would not receive any special treatment from the court, that he would be subject to the same standards as an attorney, and that the State would be represented by the prosecutor, who was a "very good trial attorney" and "well versed in the law." *Id*. at 17-18.

[11] The trial court further advised James that his appointed counsel was prepared for the trial and had skills and expertise in preparing and presenting a defense and going to trial that James did not possess. *Id*. at 18. The trial court further informed James that his attorney knew how to do things like examine and cross-examine witnesses, call favorable witnesses, file motions, tender jury instructions, make proper objections, and present effective opening and closing arguments, all of which James had no background or experience in doing. *Id*. at 18. After hearing all of this, James responded that he understood. *Id*. The trial court also warned James how difficult it was to go to trial with no legal background or experience, which were things that attorneys go to school for years to learn, but James still insisted he wanted to proceed pro se and that if he was going to be found guilty, he preferred to "do it on my own," rather than have an attorney who "I don't trust that he would help defend me and get me

found not guilty." *Id.* at 18, 19. The trial court acknowledged that James had the right to represent himself, but advised him that it wanted to impress on James "the reality of the situation," which was that "nearly all instances it is not in your best interest to proceed pro se." *Id.* at 19. The trial court then inquired whether James still wished to waive his right to have an attorney represent him even after hearing everything the trial court had just told him. *Id.* at 20. James answered affirmatively and confirmed to the trial court that he was making this choice "voluntarily and of [his] own volition." *Id.* The trial court then "reluctantly" granted James's request to waive counsel and proceed pro se. *Id.*

[12] As to the factors to be considered, the first two factors set forth in *Poynter* focus on whether the defendant had sufficient information about the dangers and disadvantages of self-representation, either through the trial court's inquiry or through any other evidence in the record. *Taylor*, 944 N.E.2d at 90. Here, the trial court had a thorough discussion with James about the pitfalls and disadvantages of proceeding pro se and made a full inquiry into his decision to represent himself. The trial court advised James that, by proceeding pro se, he ran the risk of conducting a defense to his own detriment, he would not receive any special treatment from the court, and he would be held to the same standards as an attorney, who had special schooling and experience in participating in a trial. The trial court additionally informed James of all of the aspects of a trial that an attorney was experienced in doing and that it was probably not in his best interest to represent himself. James still insisted that he

wished to proceed pro se. The record demonstrates that the trial court fully explained the advantages of having counsel represent him and the possible dangers and disadvantages of self-representation and that James understood these warnings.

[13] The third *Poynter* factor concerns whether a defendant has the background and experience necessary to make a knowing, voluntary, and intelligent waiver of his right to counsel. *Id*. In the present case, the trial court inquired into James's education level and emphasized James's lack of legal education. Although James lacked extensive formal education, he was still clearly aware that he had the right to an attorney. *See id*. at 91 (finding a valid waiver of counsel in part because Taylor was "no stranger to the criminal justice system" based on his "relatively extensive criminal history"). The record shows that James was very experienced with the criminal justice system as he had accumulated twenty prior misdemeanor convictions and five prior felony convictions and had also had numerous other charges that were dismissed. *Conf. App.* at 70-75. James was, therefore, familiar with his right to counsel, with the services that an attorney could provide and the advantages of having an attorney in a criminal prosecution, and with the consequences that flow from a criminal conviction. Thus, the record shows that James had the background and experience necessary to make a knowing, voluntary, and intelligent waiver of his right to counsel.

[14] The fourth *Poynter* factor examines the context of the defendant's decision to proceed pro se. If a defendant's decision to proceed pro se appears tactical,

then this factor weighs in favor of finding a knowing, voluntary, and intelligent waiver. *Poynter*, 749 N.E.2d at 1128 n.6. In the present case, James was upset with his appointed counsel over issues related to the preparation of his defense, and he told the trial court that he would rather "go pro se," and he felt that he could do a better job "all by himself." *Id*. at 12-13, 16. Based on the contentious relationship between James and his counsel, he believed representing himself was to his strategic advantage because he preferred to "do it on my own," rather than have an attorney that "I don't trust that he would help defend me and get me found not guilty." *Id*. at 18, 19. Therefore, at the time that James voiced his desire to represent himself, he considered it a tactical decision because he did not believe that he could receive a favorable defense by continuing with his appointed counsel.

[15] Under the facts and circumstances of this case, we conclude that James made a knowing, voluntary, and intelligent waiver of his right to counsel. The trial court conducted a thorough inquiry into James's desire to represent himself and informed him of the dangers and disadvantages of proceeding pro se, which James stated that he understood. Additionally, although James did not have much formal education, he had a lengthy criminal history that demonstrated that he was familiar with the trial process and the advantages of having the assistance of counsel. Further, James's desire to represent himself stemmed from his belief that he wanted to proceed on his own and thought he could a better job without counsel. We, therefore, find that James was not denied his right to counsel.

[16] James argues that his assertion of his desire to represent himself was not unequivocal and clear because, while he told the trial court that he wanted to represent himself, he also told the trial court that he was not prepared to proceed to trial immediately. However, everything James cites to in support of this claim occurred after he had requested to proceed pro se and after the trial court had granted his request to represent himself. Additionally, at no point during that additional discussion with the trial court did James ever waver about his desire to represent himself. Instead, during this discussion with the trial court, James complained about the fact that the trial was going to begin immediately, without allowing him more time to prepare his defense. *Id*. at 21-25. He never indicated during that dialogue with the trial court that he had changed his mind about representing himself nor did he ask to have his attorney re-appointed at that time. Moreover, before the trial court granted his right to represent himself, it had cautioned him that the trial was going to begin that day, and the court again reminded him of this when he complained about beginning the trial that day. *Id*. at 16-17, 21. This argument by James does not change our conclusion that he made a knowing, voluntary, and intelligent waiver of his right to counsel.

## II. Prosecutorial Misconduct

[17] James argues that the State committed prosecutorial misconduct when, during the first pass at voir dire, the prosecutor asked questions of the potential jurors about what they thought about James representing himself. He maintains that the questions posed to the jurors were irrelevant and that the answers were

prejudicial to him and chilled his constitutional rights. James contends that such answers chilled his ability to assist in his own defense because he was cast as stupid and making bad choices in representing himself.

[18]     In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) "'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected'" otherwise. *Stettler v. State*, 70 N.E.3d 874, 881-82 (Ind. Ct. App. 2017) (quoting *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014)), *trans. denied*. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. *Lowden v. State*, 51 N.E.3d 1220, 1225 (Ind. Ct. App. 2016), *trans. denied*. "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id*. To preserve a claim of prosecutorial misconduct, the defendant must -- at the time the alleged misconduct occurs -- request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id*. at 1224. Failure to request an admonishment or to move for mistrial results in waiver. *Id.*

[19]     Here, James did not object to the questions that the prosecutor posed to the potential jurors during voir dire. Our review is different where a claim of prosecutorial misconduct has been waived. *Id*. The defendant must (1) establish the grounds for prosecutorial misconduct and (2) establish that the prosecutorial misconduct constituted fundamental error. *Id*. at 1224-25.

[20] James contends that the prosecutor committed misconduct in the questions he posed to jurors during the first round of voir dire. In questioning one juror, the prosecutor asked, "Mr. James has chosen to represent himself which he's constitutionally entitled to do. What do you think about that?" *Tr.* at 49. The juror responded "gutsy" and elaborated that he did not know if it was for money reasons "or maybe just sayin' forget it." *Id.* at 50. When questioning another juror, the prosecutor asked, "What do you think about Mr. James representing himself here?" *Id.* at 52. The juror responded, "I think it's stupid," and when asked why the juror thought this, she elaborated that James "could have had somebody represent him as a defense attorney. And I don't see, I don't know what he's trying to prove by doing it himself." *Id.* at 52-53. The first juror was seated on the jury, but the second one was not. *Appellant's App. Vol. II* at 60.

[21] The purpose of voir dire is to ascertain whether prospective jurors can render an impartial verdict based upon the law and the evidence and "weed out" those who show they cannot be fair to either side. *Gibson v. State*, 43 N.E.3d 231, 238 (Ind. 2015), *cert, denied*, 137 S. Ct. 54 (2016). "Thus, the parties may 'inquire into jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about a particular line of defense.'" *Id.* (quoting *Hopkins v. State*, 429 N.E.2d 631, 634-35 (Ind. 1981)).

[22] Here, the prosecutor asked two jurors what they thought of James representing himself during the trial. This was a proper subject to address in voir dire, and it was appropriate for the prosecutor to determine if potential jurors had a bias

regarding the situation of an unrepresented defendant. Such an inquiry explored whether jurors had any potential biases surrounding that circumstance or whether it would affect the way they viewed the trial or the evidence. This line of questioning could uncover whether the potential jurors harbored sympathy toward James due to the fact that he was a lone person facing off against the State or whether they held any bias against the State because of the situation. Additionally, the prosecutor's questions served the purpose of uncovering any potential bias against James due to his proceeding pro se, such as viewing it as evidence of guilt. Therefore, instead of prejudicing James, the questions by the prosecutor actually worked to James's advantage. We, therefore, conclude that the prosecutor did not commit misconduct when he asked two jurors during voir dire about what they thought about James representing himself. Because we determine that no misconduct occurred, we also conclude that any such alleged misconduct did not constitute fundamental error.

[23] Affirmed.

Baker, J., and Bradford, J., concur.