## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 16 2018, 10:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Joanna L. Green
Laura L. Volk
Deidre R. Eltzroth
Lindsay Van Gorkom
Deputies Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Supervising Deputy Attorney General

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Clyde Gibson,

*Appellant-Petitioner,*

    v.

State of Indiana,

*Appellee-Respondent.*

July 16, 2018

Court of Appeals Case No.
22A01-1711-PC-2528

Appeal from the Floyd Superior Court

The Honorable Susan L. Orth, Judge

Trial Court Cause No.
22D01-1703-PC-4

**Altice, Judge**

# Case Summary

William Clyde Gibson, III, pled guilty to the murder of Karen Hodella and was sentenced to sixty-five years in the Department of Correction (DOC). Gibson filed a petition for post-conviction relief and appeals the denial of that petition. He raises several issues for our review, which we consolidate and restate as whether the post-conviction court erred in denying his petition for relief.

We affirm.

# Facts & Procedural History

This appeal stems from Gibson's murder of Hodella. However, resolution of this case necessitates an account of the facts and procedural history surrounding Gibson's murders of two other women, Stephanie Kirk and Christine Whitis. As such, we set forth an account of the facts and procedural history of all three murders.

On October 10, 2002, Hodella met Gibson at a bar located in Jeffersonville, Indiana. Hodella left the bar with Gibson, and the two went to various other bars, drank alcohol, and stayed together that night. At some point, Gibson and Hodella were in a vehicle parked in an apartment complex parking lot in New Albany, Indiana. The two began to argue when Hodella accused Gibson of stealing some of her prescription medication. During the argument, Gibson hit Hodella in the face. A struggle ensued, and Gibson took out his pocket knife

and stabbed Hodella in the throat multiple times. Gibson then drove around before disposing of Hodella's body. Hodella's body was found on January 7, 2003; however, her case remained unsolved until April 2012.

Gibson met Stephanie Kirk on March 24, 2012. The next day, he sexually assaulted, strangled, and ultimately killed her. He then buried her body in his backyard. On April 18, 2012, Gibson attacked and sexually assaulted, strangled, and eventually killed seventy-five-year-old Christine Whitis, his late mother's best friend. On April 19, 2012, Whitis's mutilated body was found in Gibson's garage by his sisters. In the hours after Whitis's body was discovered, police apprehended a drunk Gibson, who was driving Whitis's vehicle.

On April 20, 2012, New Albany Police Detective Carrie East interviewed Gibson. After being read his *Miranda* rights, Gibson signed a waiver-of-rights form and agreed to speak to police. He admitted killing Whitis and confessed to murdering Hodella – a death for which he was not previously a suspect. Over the next several days, the police continued to speak to Gibson at his request, during which he confessed to Kirk's murder. At the time of his confession, the police did not know that Kirk was dead. Her body was recovered from Gibson's backyard.

On April 24, 2012, the State charged Gibson with the murders of Whitis and Hodella.[1] On May 23, 2012, the State charged Gibson with the murder of Kirk

---

[1] The State later dismissed the murder charge for Hodella and refiled it under a separate cause number.

and filed for the death penalty in the Whitis and Kirk cases. In October 2013, Gibson was tried for the murder of Whitis. The jury returned a guilty verdict on October 25, 2013, and unanimously recommended a sentence of death to which Gibson was sentenced on November 26, 2013.

[8] A jury trial was scheduled to take place on October 27, 2014, in the Hodella case. However, on March 20, 2014, Gibson pled guilty to the murder of Hodella. Per the plea agreement, neither the fact of her murder nor the conviction could be used as an aggravator in any other case, and the parties agreed that Gibson would receive a sixty-five-year sentence. On April 17, 2014, the trial court sentenced Gibson to sixty-five years in the DOC.

[9] The trial for the murder of Kirk was set to begin on June 2, 2014. Before the trial began, however, Gibson pled guilty to murdering Kirk. Under the plea, Gibson agreed to waive his right to a jury trial for the penalty phase, and further agreed that the trial court alone would decide whether to sentence him to death, life imprisonment without parole, or a term of years. After a four-day sentencing hearing, the trial court, on August 15, 2014, imposed the death penalty.

[10] Gibson appealed his convictions and sentences for the murders of Whitis and Kirk, and our Supreme Court affirmed. *See Gibson v. State*, 43 N.E.3d 231 (Ind. 2015), *cert. denied*, and *Gibson v. State*, 51 N.E.3d 204 (Ind. 2016), *reh'g denied*, *cert. denied*. He later filed a petition for post-conviction relief in the

instant case.[2] The post-conviction court denied Gibson's petition. He now appeals. Additional facts will be provided as necessary.

# Discussion & Decision

## Standard of Review

[11] The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id*. Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with P-C.R. 1(6). *Id*. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Id*. In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id*.

---

[2] Gibson also filed post-conviction petitions challenging his convictions and sentences in the Whitis and Kirk cases. All three petitions were heard during a consolidated evidentiary hearing.

[12] Gibson urges this court to "employ 'cautious appellate scrutiny' when considering the post-conviction court's findings of fact and conclusions of law" because the findings and conclusions entered are nearly identical to the proposed findings submitted by the State. *Appellant's Brief* at 13. In *Prowell v. State*, 741 N.E.2d 704, 708-09 (Ind. 2001), our Supreme Court acknowledged that a trial court's verbatim adoption of a party's proposed findings may have important practical advantages and expressly declined to prohibit the practice. The court noted, however, that the wholesale adoption of one party's findings results in an "inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Id.* at 709.

[13] We note that in the instant case, there are some differences between the State's proposed findings and those entered by the post-conviction court, and that the post-conviction court's extensive findings and conclusions (thirty pages in total) addressed all of the claims set forth in Gibson's petition. As such, we decline Gibson's invitation to modify our standard of review. *See, e.g.*, *Stevens v. State*, 770 N.E.2d 739, 762 (Ind. 2002) (court declined to hold post-conviction court's utilization of State's proposed findings constituted failure to provide full, fair, unbiased adjudication of post-conviction claims where findings and conclusions extensively addressed all claims, and post-conviction court "added two sentences to one issue, a couple of paragraphs to another, and corrected some of the misspellings" in State's proposed findings and conclusions).

[14] The basis of Gibson's post-conviction relief petition is that his trial counsel rendered ineffective assistance of counsel. Claims of ineffective assistance of

trial counsel are generally reviewed under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984); that is, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms and that his counsel's deficient performance resulted in prejudice. *Id.* at 687-88. As for the first component – counsel's performance – we have observed that "'[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Pruitt v. State*, 903 N.E.2d 899, 906 (Ind. 2009) (alteration in original) (quoting *Lambert v. State*, 743 N.E.2d 719, 730 (Ind. 2001)). As for the second component, prejudice occurs when the defendant demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability arises when there is a "probability sufficient to undermine confidence in the outcome." *Id.*

[15] A claim may be disposed of on either part of the two-part *Strickland* test. *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006). An inability to satisfy either part is fatal to an ineffective assistance claim. *Vermillion v. State*, 719 N.E.2d 1201, 1208 (Ind. 1999). Generally, we need not evaluate counsel's performance if the defendant has suffered no prejudice. And most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

# I. Illusory Guilty Plea

[16]  Gibson challenges his guilty plea. By way of background, Gibson pled guilty to murdering Hodella on March 20, 2014. Per the plea agreement, neither the fact of her murder nor the conviction could be used as an aggravator in any other case, and the parties agreed that Gibson would receive a sixty-five-year sentence. At the time of Gibson's plea, the Kirk case was still pending. In that case, the State (on May 23, 2012) had charged Gibson with Kirk's murder, alleged he was an habitual offender, and sought the death penalty based upon the aggravating circumstance set forth under Ind. Code § 35-50-2-9(b)(8), that Gibson committed another murder – namely, of Hodella. I.C. § 35-50-2-9(b) lists the aggravating circumstances the State may allege in order to seek the death penalty for murder. Subsection (b)(8) provides: "The defendant has *committed* another murder, at any time, regardless of whether the defendant has been convicted of that other murder." (Emphasis added.)[3]

[17]  Gibson contends his guilty plea was not entered knowingly, intelligently, and voluntarily because it was motivated by the State's improper threat to use Hodella's murder as an aggravating circumstance to support the imposition of a death sentence in the Kirk case. According to Gibson:

> The threat of this aggravator was improper because, at the time
> [he] was offered and accepted the plea agreement, the State did

---

[3] I.C. § 35-50-2-9(b)(8) is not to be confused with I.C. § 35-50-2-9(b)(7) which lists a separate aggravating circumstance the State may allege in order to seek the death penalty for murder, that is, "The defendant has been *convicted* of another murder." (Emphasis added.)

> not have the power under Indiana Code section 35-50-2-9(b)(8) to use Hodella's murder to support the imposition of the death penalty in [the Kirk case] . . . [because] [t]he law is settled that, when the other murder alleged has not been reduced to a conviction, this aggravator only applies to multiple murders that are related and are tried in one proceeding.

*Appellant's Brief* at 16. Gibson also argues that his counsel at trial, J. Patrick Biggs and Amber Shaw, were ineffective for failing to advise him of the illusory nature of his guilty plea.

[18] A plea bargain motivated by an improper threat is to be deemed illusory and a denial of substantive rights. *Champion v. State*, 478 N.E.2d 681, 683 (Ind. 1985). At the moment the plea is entered, the State must possess the power to carry out any threat that was a factor in obtaining the plea agreement. *Id.* The lack of that real power is what makes the threat illusory and causes the representation to take on the characteristics of a trick. *Id.* "'[A] threat by a prosecutor to do what the law will not permit, if it motivates a defendant ignorant of the impossibility, renders the plea involuntary.'" *Munger v. State*, 420 N.E.2d 1380, 1387 (Ind. Ct. App. 1981) (quoting *Lassiter v. Turner*, 423 F.2d 897, 900 (4th Cir. 1970), *cert. denied*).

[19] Our Supreme Court, in *Segura v. State*, 749 N.E.2d 496 (Ind. 2001), placed a high burden upon defendants who are claiming that an improper punitive threat compelled their guilty plea before that plea may be set aside. The court stated:

> Whether viewed as ineffective assistance of counsel or an involuntary plea, the postconviction court must resolve the factual issue of the materiality of the bad advice in the decision to plead, and postconviction relief may be granted if the plea can be shown to have been influenced by counsel's error. However, if the postconviction court finds that the petitioner would have pleaded guilty even if competently advised as to the penal consequences, the error in advice is immaterial to the decision to plead and there is no prejudice.

*Id*. at 504-05. Relying upon *Segura*, this court later held, "when an error in advice supports a claim of intimidation by exaggerated penalty, a petitioner must establish specific facts that lead to the conclusion that a reasonable defendant would not have entered a plea had the error in advice not been committed." *Willoughby v. State*, 792 N.E.2d 560, 564 (Ind. Ct. App. 2003), *trans. denied*.

[20] Gibson's particular claim on this point seems to be a hybrid of an outright claim of involuntary or illusory plea and ineffective assistance of counsel. Nevertheless, whether Gibson's claim is of an involuntary plea or ineffective assistance, he must demonstrate that the intimidation resulting from his trial counsel's failure to properly advise him was material to his decision to plead guilty. *See Segura*, 749 N.E.2d at 504; *see also Willoughby*, 792 N.E.2d at 563 (stating "it is immaterial whether [a defendant's] claim is of an involuntary plea or ineffective assistance of counsel").

[21] As evidence that his plea was induced by an improper threat, Gibson points us to testimony of his defense attorneys. Biggs testified: "All I remember was the

main thing was [Gibson's murder of Hodella] was not going to be used in the Kirk case as an aggravator." *Post-Conviction Transcript Vol. I* at 70. Shaw testified:

> And the concession that we got with the plea agreement was that it could then not be used in the death penalty cases as a prior circumstance, which was the main win as far as that goes. So that was the reason that we took the plea was because we got that concession from the State, that it could not be used against him for purposes of the death penalty.

*Post-Conviction Transcript Vol. II* at 115.

[22] Gibson is correct that the aggravator addressed in I.C. § 35-50-2-9(b)(8) is applicable only in "cases involving double or multiple murders for which the defendant is being tried in one proceeding." *Hough v. State*, 560 N.E.2d 511, 519 (Ind. 1990). Gibson was charged for the murders under three separate cause numbers. As such, the State could not carry out the threat of using the I.C. § 35-50-2-9(b)(8) aggravator in another prosecution. Indeed, on April 4, 2014, fifteen days after Gibson pled guilty to the murder of Hodella, the State acknowledged as much:

> [B]ased upon our plea agreement that we had entered into approximately two weeks ago where we had agreed that we would not use the murder of Miss Hodella as an aggravating factor in [the Kirk] case. And [sic] I would also believe for that that we probably were prohibited by law, a[t] least case law. There was an argument that we could not use that, so we have removed that aggravating factor.

*Transcript from Kirk Case Vol. I* at 161-62. However, Hodella's murder could have been used as an aggravator for seeking the death penalty in the Kirk case under I.C. § 35-50-2-9(b)(7), once the murder was reduced to a conviction and without an agreement with the State to the contrary.[4] Gibson's acceptance of the plea deal in the Hodella case foreclosed all use of this aggravator in future prosecutions.

[23] Even assuming that the State's threat to use the I.C. § 35-50-2-9(b)(8) aggravator against Gibson was improper, Gibson still must show that such was material to his decision to plead guilty. We find that Gibson has not met his burden.

[24] The record reveals that Gibson confessed numerous times to different individuals to killing Whitis, Kirk, and Hodella, and the details of his confessions were corroborated. He faced the death penalty in two of the three cases. At the post-conviction hearing, defense counsel Biggs testified that "all along Mr. Gibson just kind of wanted to get things over with . . . [;] he just wanted to go ahead, admit everything, and take the death penalty." *Post-Conviction Transcript Vol. I* at 74. At the time Gibson pled guilty to murdering Hodella, he had been convicted by a jury of murdering Whitis. There was

---

[4] Under Ind. Code § 35-34-1-5, the State had the power to amend the charging information in the Kirk case and change the basis of the death penalty aggravator from Gibson *committed* the Hodella murder to Gibson had been *convicted* of the Hodella murder. *See Appellant's Appendix from Kirk Case Vol. I* at 47; I.C. §§ 35-50-2-9(b)(8), (b)(7); *see also Gibson*, 51 N.E.2d at 211 (the Kirk case) (holding trial court did not commit fundamental error when it allowed State to amend death penalty aggravator in charging information from "Gibson *committed* the Whitis murder to he had been *convicted* of it" on same day Gibson pled guilty to the Kirk murder).

overwhelming evidence of his guilt in the Hodella case. Gibson benefited substantially by pleading guilty to the murder of Hodella. The plea agreement insured that Gibson would avoid the death penalty and be sentenced to a term of years.

Gibson has not shown that that the State's threat to use the I.C. § 35-50-2-9(b)(8) aggravator was material to his decision to plead guilty. He has failed to demonstrate that he would not have pled guilty even if properly advised regarding the aggravating circumstance, and he has failed to demonstrate a showing of facts that support a reasonable probability that the hypothetical reasonable defendant would have elected to go to trial if properly advised. *See Segura*, 749 N.E.2d at 507 ("there must be a showing of facts that support a reasonable probability that the hypothetical reasonable defendant would have elected to go to trial if properly advised"). Thus, his claims of an illusory guilty plea and ineffective assistance on this basis fail.

## II. Failure to Investigate

Gibson claims that his trial counsel provided ineffective assistance for failing to adequately investigate his murder charge before advising him to plead guilty. Specifically, he argues that trial counsel (1) failed to properly investigate whether another individual killed Hodella and (2) failed to investigate the reliability of his confessions.

While it is undisputed that effective representation requires adequate pretrial investigation and preparation, it is well settled that we should resist judging an

attorney's performance with the benefit of hindsight. *Badelle v. State*, 754 N.E.2d 510, 538 (Ind. Ct. App. 2001), *trans. denied*. Accordingly, when deciding a claim of ineffective assistance for failure to investigate, we apply a great deal of deference to counsel's judgments. *Boesch v. State*, 778 N.E.2d 1276, 1283 (Ind. 2002).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.

### A. Adequacy of Investigation

[28] Gibson maintains that counsel's performance was deficient for failing to investigate whether another individual killed Hodella. According to Gibson, information uncovered by the police, as well as the post-mortem examination of Hodella (revealing multiple facial fractures in various stages of healing and a healed right rib fracture), should have prompted counsel to investigate whether Hodella's ex-boyfriend Mike Rhodes killed her.

[29] At the post-conviction hearing, defense attorney Biggs testified that he remembered receiving discovery from the State in the Hodella case; he reviewed the discovery; and, based upon the discovery, he interviewed

Detective Rachel Lee with the Jeffersonville Police Department, who had investigated Hodella's disappearance in 2002. Biggs further testified that "almost a week before" he became involved in Gibson's case, Gibson "had already confessed to murdering . . . Ms. Hodella," and that the details of the confession had been corroborated. *Post-Conviction Transcript Vol. I* at 50. Biggs testified:

> [T]he Jeffersonville police had talked to various witnesses, we have their statements. She had -- Ms. Hodella had been living in Florida with a fellow named Rhodes. She came up here from Florida. And they had a lot of arguments, according to witnesses, and the last time anybody saw her they had argued in the bar at the River Falls Lounge, it was called Bill's Lounge. And Mr. Rhodes said he left there, and other witnesses said they saw Ms. Hodella leave with another gentleman that was not Mr. Rhodes. That was the last time anyone saw her.
>
> And [Gibson] had told us that he met Ms. Hodella there that night, said she had been arguing with her boyfriend, and she kind of left him and left with Mr. Gibson. So that matched up with his story. And he described her as a small blond woman, which fit Ms. Hodella's description.

*Id*. at 55-56.

[30] Biggs recalled that, when Gibson met with Mark Mabrey, the investigator hired for his case, Gibson indicated that a tattoo on his arm was "a memorialization of the killing of Ms. Hodella." *Id*. at 57. Biggs answered in the affirmative when asked if Gibson had "always maintain[ed] that he had, in fact, murdered . . . Ms. Hodella;" if Gibson communicated the confession to the investigator;

and if Gibson sent statements to the media about his involvement in the murder." *Id.* at 50. When asked if there was any competent evidence that a third party committed the crime, Biggs answered, "No." *Id.* at 58.

[31] Based upon the foregoing, we find that given Gibson's confession and the corroborating evidence, it was reasonable for trial counsel to not undertake additional investigation into whether another had murdered Hodella. Gibson's counsel adequately investigated whether Rhodes killed Hodella. Gibson has failed to establish that counsel's investigation fell below an objective standard of reasonableness.

## B. Reliability of Confessions

[32] Gibson says his counsel were ineffective for failing to investigate the reliability of his confessions to Hodella's murder and consult with a false confessions expert to assess the reliability of his confessions. According to Gibson, the reliability of his confessions was in question because the police used "suggestive questioning" during their interrogations; certain details of the confessions conflicted with police evidence (e.g., Gibson told police he stripped Hodella of her clothes and threw them out with her body, but Hodella's body was found clothed); and Gibson "confessed" to murdering several other people, but it was determined that he had fabricated those confessions so that he could receive perks from the police like coffee and cigarettes or time out of general lock-up. *Appellant's Brief* at 30, 31.

[33]     In support of his argument, Gibson points to Professor Alan Hirsch's testimony at the post-conviction hearing regarding the history and reasons behind false confessions and the police techniques and tactics that can lead to false confessions. Hirsch testified that he believed he "could have offered the [defense] team . . . opinions about the case, ways in which the confessions might be vulnerable and subject to challenge, [sic] background information about this area." *Post-Conviction Transcript Vol. II* at 17. Regarding suggestive questioning by police, he testified:

> There was also a fair amount of leading and suggestive questioning. You know, [the police] would say things like, I think with respect to Ms. Hodella, and then you took her clothes off? And [Gibson] nodded. There was one occasion where [Gibson] was shown a photograph of her and did not recognize her. And [the police] said something like this was at the gas station in 2003. And that was triggering his sense of what they were talking about, and he said, oh, that's Karen [Hodella]. And before long he was saying I'm pretty sure. And so that's a classic case of leading, suggestive questioning producing evidence.
>
> So, I would say those are the two main things. There was a fair amount of minimization[5] and there was a fair amount of suggestive and leading questioning.

---

[5] Professor Hirsch explained that "minimization" involves "communicating to the suspect that if you confess things won't be so bad . . . [;] that the crime isn't so severe and punishment won't be so severe." *Post-Conviction Transcript Vol. II* at 10.

*Id.* at 18-19 (footnote added). Despite this testimony, we are not convinced that Gibson's counsel's performance fell below an objective standard of reasonableness regarding investigating whether Gibson's confessions were reliable.

[34] Gibson repeatedly initiated contact with the police and agreed to provide statements regarding Hodella's murder, even after his counsel advised him not to, "in the very strongest possible language." *Post-Conviction Transcript Vol. I* at 15. Given Gibson's repeated desire to talk to the police, a special advisement was created and included in the advisement of rights that the police officers provided each time. The special advisement reminded Gibson of a hearing that was held before the trial court, during which the trial court and defense counsel strongly advised Gibson not to talk with the police. Regarding his statements to the police, Gibson told attorney Biggs, "I appreciate what you're doing, but . . . this is what I want to do." *Id.* Biggs reviewed Gibson's statements to the police and did not find evidence that he believed supported a finding that Gibson's confessions were coerced.

[35] Trial counsel also had Gibson psychologically and neurologically evaluated to determine whether Gibson had any brain damage, based upon information that Gibson may have hit his head a few times, that could have cast doubt on the accuracy of his confession. The neurologist determined that Gibson had no brain damage. Another neurologist determined that Gibson showed no evidence of cognitive impairment.

[36] At the post-conviction hearing, Biggs testified that the defense team did not consider a strategy for challenging the reliability of Gibson's confessions because Gibson had confessed multiple times. Moreover, Gibson's confessions were corroborated. Specifically, Gibson knew and communicated accurate facts about Hodella; he identified her middle name; he knew she had a distinct tattoo; and he was able to take the police to within fifty feet of where her body was found.

[37] Under these circumstances, we cannot conclude that Gibson's counsel failed to adequately investigate the reliability of Gibson's confessions and explore whether a false confession expert would have been beneficial to Gibson's case. We find that Gibson's trial counsel was not ineffective in this regard.

## III. Erroneous Findings

[38] Gibson next claims that the post-conviction court erred in making certain findings. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Stevens*, 770 N.E.2d at 746. We will not reweigh the evidence or judge the credibility of the witnesses; we examine only the probative evidence and reasonable inferences that support the decision of the post-conviction court. *Conner v. State*, 711 N.E.2d 1238, 1245 (Ind. 1999).

[39] Gibson specifically argues that the post-conviction court erred in finding that: (1) his trial counsel's investigation into Hodella's murder included interviewing a police detective and employing a defense investigator to review discovery and

Gibson's statements to the police; (2) trial counsel acted reasonably by not further investigating Hodella's murder; (3) there was no reason to doubt the reliability of Gibson's confessions; and (4) trial counsel was not deficient for failing to pursue a defense that Rhodes was Hodella's actual killer. Although Gibson's arguments overlap, we address each in turn. However, we conclude that Gibson has failed to carry his burden to show that the post-conviction court's findings are clearly erroneous.

### A. Police Detective and Investigator

[40]     Gibson asserts that, contrary to the post-conviction court's findings, his counsel did not interview Detective Rachel Lee (with the Jeffersonville Police Department) and did not use investigator Mark Mabrey's services to investigate Hodella's murder. However, attorney Biggs testified that he did interview Detective Lee. Regarding the use of the investigator, the record supports the post-conviction court's finding that "Mabrey reviewed the discovery received by trial counsel and all of Petitioner Gibson's statements." *Appellant's Appendix Vol. II* at 210. The post-conviction court's finding is not clearly erroneous.

### B. Murder Investigation

### 1. Adequacy of Investigation

[41]     Gibson contends the post-conviction court's "finding [that] trial counsel acted reasonably by not further investigating [Hodella's murder]" was clearly erroneous based upon "the information known to trial counsel." *Appellant's Brief* at 25, 26. We already have determined that trial counsel did not render

deficient performance in investigating whether another individual killed Hodella and the reliability of Gibson's confessions.

## *2. Blood-Stained Clothing*

[42] Gibson also argues that "[t]o the extent the post-conviction court found that [bloody clothes found in a dumpster near the time when Hodella was killed] were evidence of Gibson's guilt that [justified] trial counsel's failure to investigate Hodella's murder, this finding was clearly erroneous." *Id*. at 27. We disagree.

[43] Blood-stained clothes were found in a dumpster in Corydon, Indiana, on October 11, 2002, the day after Hodella was killed. When Gibson confessed to killing Hodella in 2012, he told the police that, after he stabbed her to death, he disposed of his and her clothes in a dumpster in Corydon.[6] The post-conviction court found, and the facts of the case support, that "bloody clothes were discovered by police shortly after [the date Hodella was killed], in what was an independent investigation at the time." *Appellant's Appendix Vol. II* at 211. This finding was not erroneous. Furthermore, the post-conviction court's conclusion that trial counsel adequately investigated Gibson's murder of Hodella was not based solely on the evidence of the bloody clothes, but also was based upon

---

[6] DNA testing was performed on the clothing. The laboratory found a DNA profile, but it was determined that the clothes were not connected to any of the murders that Gibson committed.

Gibson's confessions and the corroboration of the details of the confessions. No error occurred here.

### C. Reliability of Gibson's Confessions

[44] Gibson claims the post-conviction court erroneously found no reason to doubt the reliability of his confessions. Gibson essentially rehashes the arguments presented in section II.B. above. There is ample evidence of the reliability of Gibson's confessions. The post-conviction court's finding that there was no reason to doubt the reliability of Gibson's confessions is not clearly erroneous.

### D. Potential Defense – Another Individual Killed Hodella

[45] Gibson also argues that the post-conviction court erred in finding that his trial counsel was not deficient for failing to pursue a defense that Rhodes killed Hodella. The crux of this claim was addressed in section II.A. above. Defense counsel investigated whether someone other than Gibson committed the murder but concluded, based upon Gibson's confessions and the corroboration of the details of the confessions, that there was no competent evidence that a third party committed the crime. Gibson has failed to carry his burden to show that the post-conviction court clearly erred in making this finding.

## IV. Conflict of Interest

[46] Gibson alleges that he was denied effective assistance because Biggs had a conflict of interest. Gibson asserts that Biggs's obligation as Chief Public Defender to oversee the fiscal demands of the public defender's office "collided with his duty of loyalty to Gibson." *Appellant's Brief* at 42. Put another way,

Biggs's obligations regarding overseeing the public defender's office resulted in Biggs being pressured to keep costs associated with Gibson's capital cases as low as possible, which adversely affected his representation of Gibson in the Hodella case. Presumably due to the conflict, Biggs did not immediately assemble critical members of a defense team and did not adequately investigate the Hodella case.

[47] The federal constitutional right to effective assistance of counsel necessarily includes representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To establish a violation of the Sixth Amendment due to a conflict, a defendant who failed to raise the objection at trial must demonstrate that trial counsel had an actual conflict of interest and that the conflict adversely affected counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980); *Strickland*, 466 U.S. at 692. Gibson has not met his burden.

[48] Biggs had been the Chief Public Defender in Floyd County for nearly twenty years, and his duties included overseeing the operation of the public defender's office. Biggs was appointed to represent Gibson on or about April 27, 2012. After his appointment, Biggs reduced his caseload and hired a part-time public defender to handle new cases assigned to the office. Biggs did not have concerns about being appointed Gibson's counsel and serving as Chief Public Defender because, per Biggs, the chief public defender position "didn't take that much of [his] time." *Post-Conviction Transcript Vol. I* at 13. The trial court

reassessed Biggs's compliance with Crim. R. 24,[7] as it related to his chief public defender administrative duties and determined that Biggs was compliant.[8]

[49]     Biggs testified that he did not delay in working on Gibson's defense and that meeting the requirements of Crim. R. 24 did not affect his ability to represent Gibson. Biggs received discovery from the State and conducted interviews. Biggs hired several individuals to work on Gibson's defense, including an investigator, a mitigation specialist, jury consultants, an alcohol use/abuse specialist, a neurologist, and psychologists. For the Hodella case, Biggs specifically hired a former chief medical examiner to review autopsy reports and also hired an expert on correctional systems. Biggs did not hire additional experts for the Hodella case because "[w]e believed that these cases were going to come down to a matter of what kind of case we could make for mitigation. And, basically, you had the same factor in all three cases." *Post-Conviction Transcript Vol. I* at 22.

---

[7] Crim. R. 24 addresses capital cases.

[8] After Biggs filed his appearance, the State Public Defender Commission met and discussed whether a chief public defender should be lead counsel in a capital case. On April 9, 2013, Larry Landis, Executive Director of the Indiana Public Defender Council, sent a written memorandum to the Indiana Supreme Court advocating for a change to Crim. R. 24 to prohibit the appointment of a chief public defender in a capital case. David Powell, Executive Director of the Indiana Prosecuting Attorneys Council, also sent a written memorandum to the Indiana Supreme Court advocating for chief public defenders to remain available for appointment in capital cases. Effective in May of 2013, our Supreme Court amended the rule to include that before a chief or managing public defender may be appointed to represent a capital defendant, a court must assess the impact of the appointment on the attorney's workload, including the administrative duties. *See* Crim. R. 24(B)(3)(b).

[50] Biggs testified at the post-conviction hearing that he was never questioned about the costs associated with representing Gibson and that he did not feel pressure to save the county money when determining Gibson's defense needs. Specifically, "no one ever spoke to me about it. There was nothing unspoken, there was no . . . pressure by anyone regarding the costs. As a matter of fact, I figured the costs, and including the appeal it came to [a very large amount]. And . . . no one ever said anything about it, we just turned in the claims and they were paid." *Id*. at 45. When asked if Biggs believed his role as Chief Public Defender, and the administrative duties associated therewith, created a conflict of interest with representing Gibson, Biggs replied: "I am always morally, ethically and legally bound not to frivol away the funds of the county. By the same token, I am morally bound, ethically bound to spend whatever I deem is reasonable to spend in a capital case. . . . All the money was spent because there was a need." *Id*. at 47. Biggs further testified that defense decisions were not made out of a concern to keep costs low.

[51] Gibson has not demonstrated that his trial counsel had an actual conflict of interest. His claim that he was denied effective assistance due to a conflict of interest fails.

[52] The post-conviction court did not err in denying Gibson's petition for relief. Judgment affirmed.

Robb, J. and Brown, J., concur.