## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2019, 10:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael W. Willhoite, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 17, 2019 <br><br> Court of Appeals Case No. <br> 19A-CR-158 <br><br> Appeal from the <br> Madison Circuit Court <br><br> The Honorable <br> Thomas Newman, Jr. <br><br> Trial Court Cause No. <br> 48C03-1601-F1-144 |

**Kirsch, Judge.**

[1] Following a jury trial, Michael W. Willhoite ("Willhoite") was convicted of child molesting[1] as a Level 1 felony and incest[2] as a Level 4 felony. The trial court sentenced him to twenty-five years for child molesting and a concurrent six years for incest for an aggregate sentence of twenty-five years. On appeal, Willhoite raises the following restated issues:

> I. Whether the trial court abused its discretion when it denied Willhoite's motion for continuance on the eve of trial;

> II. Whether statements made by the prosecutor during closing argument—statements to which Willhoite raised no objection at trial—constituted prosecutorial misconduct, the cumulative effect of which rose to the level of fundamental error; and

> III. Whether Willhoite's convictions for child molesting and incest violated Indiana's prohibition against double jeopardy.

[2] We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[3] Willhoite and S.Y. were married and had three daughters, J.W., T.W., and S.W. In 2015, after Willhoite and S.Y.'s marriage ended, Willhoite and his

---

[1] *See* Ind. Code § 35-42-4-3(a)(1).

[2] *See* Ind. Code § 35-46-1-3.

daughters lived together in a home in Anderson, Indiana, with Willhoite's mother. Willhoite slept in a makeshift bedroom in the attic. The girls occasionally slept with Willhoite in his bed, sometimes all together, and other times just one of the girls slept with him. Once, when T.W. was alone in bed with Willhoite, he put his hand on her thigh and touched both the inside and outside of her leg. *Tr. Vol. III* at 19, 22, 30-31. T.W. pushed Willhoite's hand off. When he put his hand back on T.W.'s thigh, she went "to the bottom of the bed" to sleep. *Id*. at 19. T.W. did not tell anyone about the incident. *Id*. at 31.

[4] Sometime after December 25, 2015, when she was nine years old, T.W. was sleeping on her side in Willhoite's bed and was awakened when he "put[] his penis in [her] butt." *Id*. at 13-14. Willhoite was "moving" his penis by "pulling it out and putting it back in"; T.W. estimated that Willhoite continued this motion for one to two minutes. *Id*. at 14, 15. T.W. said that while Willhoite initially made no sound, he later "started to moan." *Id*. at 15. T.W. began to turn around because she "didn't know what he was gonna do next" and saw Willhoite "pulling up his pants the rest of the way." *Id*. at 16. T.W. sat up and asked, "[D]ad, can I use the restroom?" *Id*. at 17. When Willhoite said, "[Y]eah, you don't have to ask," T.W. pulled up her pants and "went downstairs to the restroom to think about what [she] was gonna do because [she] was scared." *Id*.

[5] Leaving the bathroom, T.W. went into her grandmother's bedroom, where her grandmother was already sleeping. T.W. used tote bags and blankets to cover

herself and fell asleep on her grandmother's bedroom floor. *Id.* at 18. T.W.'s grandmother did not wake up, and T.W. left the room the next morning without anyone seeing her. *Id.* Shortly thereafter, T.W. told her older sister, J.W., what had happened. T.W. explained, that J.W. "was always there for [her,] and [T.W.] knew it was good if [she] told somebody." *Id.* at 20. J.W. said that, when T.W. told her about the incident, T.W. was "afraid and like scared," and she was "very emotional," which was not normal for T.W. *Id.* at 64. T.W. told J.W. not to tell anyone about the incident, but J.W. thought she should tell someone, so she told their aunt. *Id.* at 65. The aunt subsequently informed T.W.'s mother, S.Y. Soon thereafter, T.W. and her sisters were interviewed at Kids Talk, "a forensic interview location" with a specialty in interviewing child victims. *Id.* at 20, 107. During the interview, T.W. related the same details of the sexual assault.

[6] After the interview, S.Y. took T.W. to an Anderson hospital for a sexual assault exam. *Tr. Vol. III* at 71. On the way there, S.Y. asked T.W. what Willhoite had done. *Id.* Although T.W. was scared and crying, she told her mother how Willhoite had sexually assaulted her. *Id.* The results of T.W.'s medical examination were normal; the exam found no physical injuries or DNA present. On January 25, 2016, Willhoite, who was at that time thirty-one years old, was arrested and charged with Level 1 felony child molesting and Level 4 felony incest. *Id.* at 113.

[7] Willhoite's trial was initially set for May 24, 2016. The trial court granted numerous continuances during the next two and a half years before trial. At

least four of those continuances were requested by Willhoite. On the eve of what was then a November 26, 2018 trial date, the trial was continued to November 28, 2018, by agreement of both parties. *Appellant's App. Vol. II* at 17. On November 26, 2018, defense counsel, David Alger ("Alger"), filed an amended motion for continuance, arguing that his father was ill, and his illness would prevent Alger from giving the trial his full attention. *Id*. at 153. The trial court denied that motion. *Id*. at 17. On November 28, 2018, after defense counsel had engaged in extensive voir dire, and a jury was empaneled, Alger renewed his motion for a continuance, which the trial court again denied. *Tr. Vol. II* at 242.

[8] A jury trial was held November 28 and 29, 2018. Willhoite's defense during trial was that T.W. had fabricated the story about him because she was mad at him and jealous of her sisters. To counter the fact that T.W.'s physical examination showed no sign of injury, the State offered the testimony of Holly Renz ("Renz"), a sexual assault nurse examiner employed by Community Hospital in Anderson. Renz explained the examination procedure and said, "[A]bout ninety-five percent (95%) of [the] time we see normal exams." *Tr. Vol. III* at 45. Renz said that one of the reasons for a normal exam is "the perpetrator . . . may groom the child in such a way that there is no injury." *Id*. at 46. Furthermore, there is delayed disclosure because "children generally are told not to tell and they don't," and injuries may not show because "our bodies can heal very quickly." *Id*. at 45-46.

[9] During closing argument, defense counsel suggested that Willhoite could not be the monster that T.W. had claimed; otherwise he would have abused his other daughters and would have sexually abused T.W. more than once. *Tr. Vol. III* at 151-52. The prosecutor responded, in closing argument, that he was not asking the jury to call Willhoite a monster; he only wanted them to find that he is a "molester, cause he is, cause that's what he did." *Id*. at 156. Suggesting an alternate theory as to why T.W. might be the only victim, the prosecutor said:

> I thank God that he didn't do this to the other girls. But I think had he gotten away with this he probably would have. I think T.[W.] saved her sisters. . . . Because there's a grooming behavior. He started with just sleeping with [T.W.], putting his arm around her. He told you he'd snuggle, spoon. Put his hand on a thigh. She didn't like it so she moved it, he put it back. Waited. When she didn't tell anyone he went further. That's grooming.

*Id*. at 156. Willhoite did not object. *Id*.

[10] At the conclusion of trial, the jury found Willhoite guilty of both child molesting and incest, and the trial court sentenced him to twenty-five years for the Level 1 felony child molesting conviction and a concurrent six-year sentence for the Level 4 felony incest conviction, for an aggregate sentence of twenty-five years. Willhoite now appeals.

# Discussion and Decision

## I. Denial of Continuance

[11] Willhoite contends that the trial court abused its discretion when it denied his request for a continuance on the eve of trial. As our Supreme Court noted in *Gibson v. State*:

> Courts are generally reluctant to grant continuances in criminal cases merely to allow for additional preparation. But a defendant is statutorily entitled to a continuance where there is an absence of material evidence, absence of a material witness, or illness of the defendant, and the specially enumerated statutory criteria are satisfied. If none of those conditions are present, however, a trial court has wide discretion to deny a motion to continue. We will only find an abuse of that discretion where a defendant was prejudiced as a result of not getting a continuance. To demonstrate such prejudice, a party must make a specific showing as to how the additional time requested would have aided counsel.

43 N.E.3d 231, 235-36 (Ind. 2015) (internal citations and quotations omitted), *cert. denied*, 137 S. Ct. 54 (2016). In other words, "continuances . . . will be granted only in the furtherance of justice on a showing of good cause." *Harbert v. State*, 51 N.E.3d 267, 279 (Ind. Ct. App. 2016), *trans. denied*. "'There is a strong presumption that the trial court properly exercised its discretion.'" *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018) (quoting *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002)). Here, Willhoite was not statutorily entitled to a continuance.

[12] Willhoite's trial was initially set for May 24, 2016. During the two-and-a-half-year period between Willhoite's arrest and his November 28, 2018 trial, the trial court reset his trial date nine times, twice due to congestion of the court, three times due to joint motions for continuance, and four times due to Willhoite's motions for continuance. Closer to trial, the trial court denied two of defense counsel Alger's motions for continuance, one filed on November 7, 2018 relating to the November 26, 2018 trial date and one filed on November 26, 2018 relating to the November 28, 2018 trial date.[3] *Appellant's App. Vol. II* at 17, 53-54, 59-61, 84-86, 88-89, 118-120, 125-26.

[13] In his November 26, 2018 amended motion, Alger asserted a continuance was needed because: (1) he assists his mother in providing care to his father, who is ninety-five years old and suffers from COPD and liver cancer; (2) just the previous day, his father had lost the use of his legs, was less responsive, and was hospitalized; (3) he would be spending each evening at his father's bedside; and (4) his "attention would be diverted from his representation of defendant." *Id.* at 153. The trial court denied Alger's motion on November 27, 2018. On November 28, 2018, following extensive voir dire and the empanelment of the jury, Alger renewed his November 26 motion to continue trial. The State objected, and the trial court responded, "Court denies the motion for

---

[3] By agreement of the parties, the November 26, 2018 trial date was continued to November 28, 2018. *Appellant's App. Vol. II* at 17.

continuance. I will be happy to be reconsidered [sic] if other issues—other exigencies happen." *Id*. at 242-43.

[14] Willhoite contends he "suffered prejudice because the denial of the continuance meant he was represented by an attorney who was distracted by the terminal illness of his father and who was spending his evenings with his hospitalized father." *Appellant's Br.* at 8. However, Willhoite did not "make a specific showing as to how the additional time requested would have aided counsel." *Gibson*, 43 N.E.3d at 236. Willhoite did not introduce any evidence that Alger was distracted at trial. In fact, the transcript reveals that Alger was engaged, attentive, asked appropriate questions during voir dire and trial, effectively cross-examined the State's witnesses, presented an affirmative defense, and objected when necessary. Here, while Willhoite was charged with two felonies, the evidence for the charges was the same for both, Willhoite's trial was held more than two and a half years after he was charged, Willhoite's trial date was rescheduled about nine times, and Willhoite, himself, was granted four continuances. Thus, Willhoite was not prejudiced by the denial of the continuance.

[15] We sympathize with an attorney who is dealing with both personal issues and the responsibility of trying a criminal case; however, a continuance is for the protection of a defendant, and in the absence of prejudice, the trial court does not abuse its discretion when it denies a motion for a continuance. *See Elmore v. State,* 657 N.E.2d 1216, 1218-19 (Ind. 1995) (denial of continuance upheld in case involving five felony charges, when the attorney had only one month to

prepare); *Tharpe v. State*, 955 N.E.2d 836, 844 (Ind. Ct. App. 2011) (no abuse of discretion in denying continuance of defendant's case, which consisted of one felony count and had been ongoing for over a year), *trans. denied; Schmid v. State,* 804 N.E.2d 174, 178 (Ind. Ct. App. 2004) (no abuse of discretion when court denied continuance in murder case because the case "had been pending for quite some time" and two months was "adequate time [for counsel] to prepare."), *trans. denied.* Considering this precedent, we cannot say the trial court abused its discretion when it denied Willhoite's final motion for continuance.

## II.  Closing Argument

[16]  Willhoite next challenges his convictions on the grounds of prosecutorial misconduct, citing the prosecutor's statements during closing argument that Willhoite groomed T.W. Willhoite argues that it was inappropriate for the State to reference "grooming" because the concept was raised only once during Renz's testimony at trial. *Appellant's Br.* at 10.

[17]  When we review a claim of prosecutorial misconduct that was properly raised in the trial court, "we determine (1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). "A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by

itself, is not misconduct." *Id*. (citing *Mahla v. State*, 496 N.E.2d 568, 572 (Ind. 1986)). "'Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.'" *Id*. (quoting *Cooper*, 854 N.E.2d at 835 (citations omitted)). "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Id*. Here, Willhoite did not object to the State's reference to "grooming" in its closing argument.

[18]    "Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, waived for failure to preserve the claim of error." *Id*. "The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. *Id*. at 667-68. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Id*. at 668 (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). In other words, to establish fundamental error, the defendant must show that, under the circumstances, "the trial judge erred in not sua sponte raising the issue because alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process' and (b) 'present an undeniable

and substantial potential for harm." *Id*. (internal quotation marks omitted). The element of such harm is not established by the fact of ultimate conviction but rather "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Id*. (quoting *Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994)).

[19] Our evaluation of fundamental error requires this court to look at the alleged misconduct "in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible." *Ryan,* 9 N.E.3d at 668. At trial, Willhoite's defense was that T.W. concocted the story about the assault, either because she was jealous of her sisters and hoped for attention or because she was mad at Willhoite. *Tr. Vol. III* at 28-30. On cross-examination, defense counsel confirmed that T.W. received no treatment at the hospital and that she had not told her grandmother about the sexual assault. *Id*. at 32. Through this line of questioning, defense counsel suggested that T.W.'s account of events was not credible. *Id*. at 32.

[20] During the State's initial closing argument, the prosecutor said that T.W. had not made up the story; she was not jealous of her sisters, and she was not mad at Willhoite. *Id*. at 138. The prosecutor related that T.W.'s demeanor on the stand was that of a young girl who is afraid and does not want to talk about the assault. *Id*. The prosecutor then set forth the elements of the crimes and

reviewed the testimony. The prosecutor explained that T.W. did not tell her grandmother because T.W. did not think her grandmother would believe her. *Id*. at 142. On the way to the hospital, T.W. shared with her mother the same version of events surrounding the assault that she had shared with her sister and Kids Talk. T.W.'s mother noticed that she was trembling but not talkative during the physical examination. *Id*. at 146.

[21] During defense counsel's closing argument, Alger told the jury that the case was about the testimony of two people, Willhoite and T.W. *Id.* at 151. Recognizing that there was no medical testimony or DNA that linked Willhoite to the crime, defense counsel said that the hard thing about the case was that one of them "has to be telling the truth and one has to be telling a lie." *Id*.

> If T.[W.] is telling the truth, Michael Willhoite is a monster. A monster. You heard his testimony. Can you say beyond a reasonable doubt that Michael Willhoite is a monster? Does he appear to be a monster to you? Wouldn't a monster be someone who not only has violated and molested one of his daughters, wouldn't he have violated and molested another, both older and younger? Wouldn't he have violated and molested her more than once? If you believe T.[W.], Michael Willhoite is a monster. But nine (9) year old girls can also lie.

*Id*. at 151-52.

[22] In rebuttal, the prosecutor said:

> I'm not gonna ask you to call him a monster cause it's not our job. I'm gonna ask you to find him a molester, cause he is, cause that's what he did. We talked a little bit about grooming. They

said grooming is some—they don't things [sic]. And he said if he would have done this he would have done it to the other two (2) girls. I thank God that he didn't do this to the other girls. But I think had he gotten away with this he probably would have. I think T.[W.] saved her sisters. How do I—Why do I think this? Because there's a grooming behavior. He started with just sleeping with [T.W.], putting his arm around her. He told you he'd snuggle, spoon. Put his hand on a thigh. She didn't like it so she moved it, he put it back. Waited. When she didn't tell anyone he went further. That's grooming.

*Id*. at 156.

[23]     During the State's initial closing argument, the State made no mention that Willhoite was grooming T.W. Instead, the State focused on the elements that it had to prove to convict Willhoite of child molesting and incest. *Id*. at 137-51. It was Alger who suggested to the jury that the case could be decided on the one issue of whether T.W. lied. *Id*. at 152. To cast doubt on T.W.'s testimony, defense counsel suggested for the first time that Willhoite was not the monster he seemed because he had not molested his other daughters and he had molested T.W. only once.

[24]     Read in context, the prosecutor's comments regarding grooming behavior arose from Renz's testimony at trial, when she said that one of the reasons for a normal exam is the perpetrator "may groom the child in such a way that there is no injury." *Tr. Vol. III* at 46. Furthermore, the prosecutor was making a direct rebuttal to defense counsel's implication that, because Willhoite had not molested his other daughters, he must be innocent of having molested T.W.

Willhoite slept with T.W. on numerous occasions, and prior to this incident, he had put his hand on the inside and outside of T.W.'s thigh even after she told Willhoite to stop. T.W. told no one about that incident. The State's comments offered an alternative theory as to why T.W. could be telling the truth and, yet, still be the sole victim. It remained within the purview of the jury to determine who was telling the truth.

[25] To prove fundamental error Willhoite faced the heavy burden of showing that the alleged errors were so prejudicial as to make a fair trial impossible. *Ryan*, 9 N.E.3d at 668. Based on the evidence before us, we cannot say that the prosecutor's comments amounted to prosecutorial misconduct, let alone misconduct that constituted fundamental error. The State did not commit misconduct during its rebuttal to defense counsel's closing argument.

## III. Double Jeopardy

[26] Finally, Willhoite contends that because he committed only one act of sexual misconduct against T.W., his convictions for Level 1 felony child molesting and Level 4 felony incest violated the Indiana prohibition against double jeopardy. *Appellant's Br.* at 12. The State agrees that Willhoite's convictions for child molesting and incest cannot both stand. *Appellee's Br.* at 14.

[27] The Indiana Double Jeopardy Clause, Article 1, Section 14 of the Indiana Constitution, provides, "No person shall be put in jeopardy twice for the same offense." "'[T]wo or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the

statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.'" *Howell v. State*, 97 N.E.3d 253, 263 (Ind. Ct. App. 2018) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)), *trans. denied*.

[28] Willhoite's double jeopardy challenge is based on the actual evidence used to convict him. *Appellant's Br.* at 12. Under the "actual evidence" test, the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Howell*, 97 N.E.3d at 264. The State agrees that "[t]here was a reasonable possibility that the jury used the same facts to find [Willhoite] guilty of child molesting and incest because the evidence established only one act of sexual misconduct." *Appellee's Br.* at 15 (citing *Tr. Vol. III* at 13-14, 18).

[29] When a double jeopardy violation has occurred, the "reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation." *Thompson v. State*, 82 N.E.3d 376, 383 (Ind. Ct. App. 2017) (citing *Richardson*, 717 N.E.2d at 54), *trans. denied*. However, if doing so will not eliminate the violation, one of the convictions must be vacated. *Id.* Reducing either of Willhoite's convictions will not eliminate the double jeopardy violation, so we must vacate his conviction for Level 4 felony incest since it is the conviction with a lesser penal consequence. *See Richardson v. State*, 717 N.E.2d 32, 55 (Ind. 1999) (when two convictions cannot stand, the conviction with the less severe penal

consequences should be vacated). Vacating this conviction and the corresponding sentence does not affect Willhoite's aggregate twenty-five-year sentence because the sentences for Level 1 felony child molesting and Level 4 felony incest were ordered to run concurrently.

[30] In conclusion, we find that the trial court did not abuse its discretion when it denied Willhoite's motion for continuance on the eve of trial. We also find that the State did not commit fundamental error or deprive Willhoite of a fair trial when the prosecutor referenced "grooming" in her closing argument. Finally, because Willhoite's convictions for both Level 1 felony child molesting and Level 4 felony incest violate the double jeopardy prohibition, we affirm his conviction for child molesting and reverse his conviction for incest and remand to the trial court to vacate that conviction. Recognizing that Willhoite's sentences were to be served concurrently, vacating the incest conviction does not alter Willhoite's aggregate sentence of twenty-five years.

[31] Affirmed in part, reversed in part, and remanded with instructions.

Baker, J., and Crone, J., concur.